IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-369 |
| | ) | |
| LAFON ELLIS | ) | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION FOR
SERVICE OF MOTION FOR RULE 17 SUBPOENA**

**INTRODUCTION**

Cybergenetics is a corporation that has developed a piece of software called TrueAllele. That software purportedly takes DNA data files and analyzes them using probabilistic genotyping algorithm. Because the person who possessed the gun in this case was not apprehended at the scene, and because regular DNA testing failed to connect Mr. Ellis to any of the evidentiary materials in this case, including the gun, the government intends to rely on TrueAllele in order to prove that Mr. Ellis is guilty of illegal gun possession.

However, probabilistic genotyping is a novel, highly criticized, evolving technology of interpreting complex DNA mixtures. Probabilistic genotyping uses complex mathematical formulas to examine the statistical likelihood that a particular person's DNA is in a given DNA mixture. The results TrueAllele provides are likelihood ratios of sample matches.

There are no independent third-party reviews of the system's internal variables considered, assumptions made by the software, the submodels and their associated uncertainties, boundaries, and interrelationships that constitute the

underlying probability model of TrueAllele. TrueAllele's validation studies have been conducted primarily by individuals associated with the company in some way,[1] raising questions about the independence of the reviews and the reliability of the studies in the broader scientific community. There are concerning potential issues with the use of secretive and uninspected algorithmic programs for complex DNA mixture analysis. The scientific validity of their methods and reliability of their implementation as software programs remains unclear and is openly questioned by some. This problem is compounded by the fact that TrueAllele refuse to publicly disclose, for rigorous and independent third-party review, their software implementation method. Therefore, asking judges and juries to rely on their results with no way of knowing how TrueAllele reached those conclusions is unfair. Without greater transparency into TrueAllele's design, construction, and internal operations, the broader scientific community cannot appropriately weigh the confidence that should be assigned to TrueAllele's conclusions.

In 2014, STRmix, TrueAllele's main competitor, was found by a judge to have coding errors, involving certain mixtures of three-person DNA samples, which created misleading results.[2] Significant coding issues were also identified in FST, a probabilistic genotyping tool that was developed by the Office of the Chief Medical Examiner in New York City.[3]  FST is no longer used by the City.

---

[1] S.A. Greenspoon et al., *Establishing the Limits of TrueAllele Casework: A Validation Study*, 60 J. FORENSIC SCI. 1263 (2015).
[2] David Murray, *Queensland authorities confirm 'miscode' affects DNA evidence in criminal cases*, Courier-Mail (Mar. 20, 2015), https://perma.cc/8ZMD-F7RF.
[3] Lauren Kirchner, *Thousands of Criminal Cases in New York Relied on Disputed DNA Testing Techniques*, ProPublica (Sept. 4, 2017), https://perma.cc/DQP6-PSNN.

On April 10, 2020, undersigned counsel, in accordance with local rules, sent a 12-page discovery letter to the government seeking additional discoverable materials not previously disclosed. The majority of the information requested concerned information to test the reliability of TrueAllele.  On April 17, 2020, the government indicated that it did not intend to respond to the letter, but that the government's file is open in this case, and counsel is free to come over and review it. The government added, however, that it thought that it had already sent over everything.

Having not received the requested TrueAllele documentation, and because Cybergenetics is a private corporation, not under the government's control, the defense properly sought the necessary information via an under seal and *ex parte* Rule 17(c) subpoena.  *See, e.g., United States v. Mills,* 2019 WL 76869 (E.D. Michigan, Jan. 2, 2019) (noting that "permitting the Government to discover all of the information a defendant has obtained through a Rule 17(c) subpoena or court order could create an unenviable choice between the defendant preserving his theory of the defense … or disclosing his whole case to the Government before trial," the court ordered defendants to provide copies of documents obtained through Rule 17(c) or court order when they make their reciprocal Rule 16 discovery available to the government). Rather than complying with the subpoena, however, Cybergenetics apparently turned over the under seal and *ex parte* subpoena to the government, in

direct violation of the wording of this Court's Order authorizing the subpoena.[4] The government then, in turn, publically disclosed this sealed document by filing it as an attachment to a publicly filed document. The government now objects to the issuance of this subpoena *duces tecum*, and has filed a "Motion for Service of Motion for Rule 17 Subpoena."

To the extent that the government's request for the subpoena motion signals its intent to challenge the issuance of the subpoena by filing a motion to quash, it is not clear the government has the requisite standing to do so. *See United States v. Raineri,* 670 F.2d 702, 712 (7th Cir.) (citing *In re Grand Jury,* 619 F.2d 1022, 1027 (3rd Cir.1980)), *cert. denied,* 459 U.S. 1035, (1982); *United States v. Nachamie,* 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000) ("A party generally lacks standing to challenge a subpoena issued to a third party absent a claim of privilege or a proprietary interest in the subpoenaed matter."); *Tomison*, 969 F. Supp. at 596; *see also Ponsford v. United States,* 771 F.2d 1305, 1308 (9th Cir.1985) (identifying proprietary interest as basis for standing). While the government mentions that trade secrets claims might be raised during litigation over the subpoena, if those interests are valid, they belong to Cybergenetics, not the government.

As set forth below, the request for and granting of the under seal and *ex parte* Rule 17(c) subpoena *duces tecum* is authorized by law.  Insofar as the government is now aware of the nature of the subpoena, undersigned counsel, contemporaneously

---

[4] "IT IS FURTHER ORDERED that the within Order, amended schedule, and subpoena be sealed and that only an authorized representative of the Federal Public Defender be permitted to view and utilize the within Order, amended schedule, and subpoena."

with the filing of this response, provided the government with a copy of the motion it

seeks. The government's motion is therefore moot, and in any event, should be denied.

I.         **The pre-trial subpoena *duces tecum* was properly issued.**

    1. *Ex Parte* **applications for pretrial production are proper.**

    The text of Rule 17(c) is silent regarding the right to secure *ex parte* subpoena

*duces tecum* returnable before trial. That, of course, necessitates resort to decisional

law and other factors. A number of courts have held that a party may make an *ex*

*parte* application for a pretrial subpoena *duces tecum. See e.g.*, *United States v.*

*Daniels*, 95 F.Supp.2d 1160, 1162-63 (D.Kan.2000); *United States v. Tomison*, 969

F.Supp. 587, 589-95 (E.D.Cal.1997); *United States v. Beckford*, 964 F. Supp. 1010,

1029 (E.D. Va. 1997); *United States v. Vigil*, CR 10-2310 JB, 2013 WL 3270995, at *8-

9 (D.N.M. June 3, 2013) ("Reading into rule 17(c) a restriction that prevents *ex*

*parte* proceedings for a subpoena duces tecum under all circumstances raises

constitutional concerns regarding discrimination against indigent defendants."); 

*United States. v. Sellers*, 275 F.R.D. 620, 625 (D. Nev. 2011); *United States v. Stewart*,

CRIM.A. 96-583, 1997 WL 103700, at *2 (E.D. Pa. Mar. 4, 1997). Further, as the court

observed in *United States v. Reyes*:

> There are strong policy reasons in favor of an *ex parte* procedure. If a
> source of evidence were to be identified before the issuance of a
> subpoena, the source or the integrity of the evidence might be imperiled.
> In addition, a party may have to detail its trial strategy or witness list
> in order to convince a court that the subpoena satisfies
> the *Nixon* standards of specificity, relevance, and admissibility. If a full
> adversary hearing was required to obtain a subpoena *duces tecum,* a
> party would be forced to reveal this information to the opposing side, a
> result which would occur even if a court declined to issue the subpoena.
> In this vein, the Court is mindful that it is often defendants who seek a

subpoena *duces tecum* on an *ex parte* basis in order to avoid disclosing their trial strategy to the Government.

*Reyes*,162 F.R.D. 468-470 (S.D.N.Y. 1995). The court in *Beckford* shared the *Reyes'*

court's reasoning, stating:

> Forcing the indigent defendant to confront the choice between issuing no trial subpoenas duces tecum (to preserve his theory of defense and thus rely on voluntary production of requested evidence) or disclosing his whole case to the Government before trial (to assure production of requested evidence) is an unconstitutional limitation on the defendant's right to compulsory process because the indigent's Sixth Amendment right to compulsory process for obtaining witnesses would mean little indeed if he were required to provide the Government with undue discovery in order to fulfill it.

*Beckford*, 964 F. Supp, at 1019 (citation, quotation marks, and alterations omitted).

Here, this Court need not rule on the appropriateness of the *ex parte* subpoena request because, as mentioned, undersigned counsel voluntarily provided the requested document to the government.

### 2. Rule 17(c) allows Mr. Ellis to obtain information needed from sources other than the government, including third-parties.

To the extent that the government is arguing that Rule 16 is the proper vehicle for discovery, the government is correct that Rule 16 sets forth the defendant's right to discovery from the government. But, Rule 16 says nothing of the defendant's right to discovery from other sources, and thus the argument that Rule 17(c) should not be used as an alternative means of seeking discovery *from the government* does not affect the propriety of seeking Rule 17(c) subpoenas directed to non-parties. As one court noted, "[t]he notion that because Rule 16 provides for discovery, Rule 17(c) has no role in the discovery of documents can, of course, only apply to documents in the

6

government's hands; accordingly, Rule 17(c) may well be a proper device for discovering documents in the hands of third parties." *Tomison*, 969 F. Supp. at 593 n. 14; *see United States v. King*, 194 F.R.D. 569, 573 n.3 (E.D. Va. 2000) (noting that problem addressed in *Bowman Dairy* of potentially allowing Rule 17(c) to be used as discovery alternative to Rule 16 is not present where Rule 17(c) subpoena is issued by defendant to third-party). A rule other than Rule 16 serves as the vehicle to get evidence from third-parties. "If this were not the case, the government could prevent defendants from obtaining material by choosing not to obtain it for itself. This perverse result cannot be intended by the Federal Rules of Criminal Procedure." *United States. v. Tucker*, 249 F.R.D. 58, 65 (S.D.N.Y. 2008), *as amended* (Feb. 20, 2008).

### 3. The materials Mr. Ellis sought are relevant to the determination of whether TrueAllele results are admissible under the Federal Rules of Evidence.

A defendant's right to subpoena documents to be produced is guaranteed by the compulsory process clause of the Sixth Amendment. U.S. Const. amend. VI, cl.3. As one court stated, "Rule 17(c) reflects the command of the Sixth Amendment that the full power and processes of the courts are available to defendants in criminal cases to help them defend against the charges brought by the Government." *Beckford*, 964 F. Supp. at 1016. The right is codified and the procedures by which the subpoena may be obtained are set forth in Federal Rule of Criminal Procedure 17. Rule 17(c) provides for the issuance of subpoenas *duces tecum*:

> A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated

therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

Fed. R. Crim. P. 17(c).

Thus, Rule 17(c) authorizes a party to subpoena the production of documents or other physical evidence within the custody and control of the individuals who must respond to the subpoena. The rule confers discretionary power to the courts to direct time of production, and also whether pre-trial "inspect[ion] by the parties and their attorneys" of the subpoenaed documents is warranted. *Id*. The rule also provides an opportunity for the holder of the subpoenaed documents to challenge a subpoena duces tecum by a motion to "quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id*.

There are only two Supreme Court cases that have addressed Rule 17(c). First, *Bowman Dairy*, 341 U.S. 214 (1951), in which the defense subpoenaed the government, and *United States v. Nixon*, 418 U.S. 683 (1974), in which the Watergate Special Prosecutor subpoenaed the President. Neither case addressed a subpoena *duces tecum* to a third-party.

In *Bowman Dairy*, the defendants were indicted for violating the Sherman Act. Prior to trial, the defendants moved (1) pursuant to Rule 16 for disclosure of all documents obtained from the defendants themselves or from anyone else pursuant to seizure or process, and (2) pursuant to Rule 17(c) for an order directing the

8

government to produce all materials—other than materials protected by attorney-client privilege or work product—that had been provided to the government by any other means. In connection with the second motion, defendants also served a subpoena *duces tecum* on the government, seeking the same documents referred to in that motion. *Bowman Dairy Co.*, 341 U.S. at 216–17. The government opposed the second motion and moved to quash the subpoena on the ground that it would require disclosure of material that had been "furnished [to] the government by voluntary and confidential informants." *Bowman Dairy Co.*, 341 U.S. at 218.

The Court held it was permissible for a criminal defendant to issue a Rule 17(c) subpoena to the government, but that because Rule 16 obligates the government to disclose certain material to the defendant, the defendant's Rule 17(c) subpoena could not exceed the scope of Rule 16. *See Bowman Dairy Co.*, 341 U.S. at 220. The Court determined "Rule 17(c) was not intended to provide an additional means of discovery." *Bowman Dairy Co.*, 341 U.S. at 220. Instead, the Court explained that it provides a method "to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Id*. Further, the subpoenas could be used only to discover material that could be considered "evidentiary." *Bowman Dairy Co.*, 341 U.S. at 219-20.

The Court suggested that Rule 17(c) could be used to gain access to Rule 16 materials that "are not put in evidence by the Government." *Bowman Dairy Co.*, 341 U.S. at 219. "[T]he defendant may subpoena them under Rule 17(c) and use them himself. It would be strange indeed if the defendant discovered some evidence by the

use of Rule 16 which the Government was not going to introduce and yet could not require its production under Rule 17." *Id.*

The Court also suggested that Rule 17(c) operated separately from Rule 16:

> There may be documents and other materials in the possession of the Government not subject to Rule 16. No good reason appears to us why they may not be reached by subpoena under Rule 17(c) as long as they are evidentiary. That is not to say that the materials thus subpoenaed must actually be used in evidence. It is only required that a good-faith effort be made to obtain evidence.

*Bowman Dairy Co.*, 341 U.S. at 219–20.

Thus, Rule 17 operates independently from Rule 16, giving the defendant the right to obtain any "evidentiary" material. The breadth of the rule depends on what "evidentiary" means, and the Court was quick to make clear that it was to be narrowly construed:

> It was not intended by Rule 16 to give a limited right to discovery, and then by Rule 17 to give a right of discovery in the broadest terms . . . . Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place *before* trial for the inspection of subpoenaed materials . . . . In short, any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena.

*Bowman Dairy Co.*, 341 U.S. at 220–21 (citation omitted).

Twenty-three years after *Bowman Dairy* came *United States v. Nixon*, 418 U.S. 683 (1974). There, upon a motion by the Special Prosecutor, the district court issued a subpoena pursuant to Rule 17(c) to the President, calling for the pretrial production of tape recordings, memoranda and transcripts relating to certain "precisely identified meetings between the President and others." *Nixon*, 418 U.S. at 688. The

President moved to quash the subpoena on three grounds, including that the Special Prosecutor had "failed to satisfy the requirements of" Rule 17(c). *Nixon*, 418 U.S. at 689. The motion was denied by the district court, and the case went immediately to the Supreme Court, which affirmed the district court's decision.[5] The decision produced the four-factor *Nixon* Test:

> [I]n order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 699-700. According to the Court, the party seeking to secure pre-trial document production under Rule 17(c) must show that the requested information is "relevant, admissible and specific." *Nixon*, 418 U.S. at 700.

The *Nixon* Court expressly left open one question of potentially great significance. In setting forth the first factor in the *Nixon* test—"that the documents are evidentiary and relevant"—the Court noted, but did not resolve, the question whether the evidentiary requirement applies when the subpoena is issued to a non-party. *See Nixon*, 418 U.S. at 699 n.12. The Court said, in relevant part:

> The Special Prosecutor suggests that the evidentiary requirement of *Bowman Dairy Co.* and *Iozia* does not apply in its full vigor when the subpoena *duces tecum* is issued to third parties rather than to the government prosecutors. We need not decide whether a lower standard exists because we are satisfied that the relevance and evidentiary nature of the subpoenaed tapes were sufficiently shown

---

[5] President Nixon resigned approximately two weeks later.

as a preliminary matter to warrant the District Court's refusal to quash the subpoena.

*Id.* (internal citations omitted).

That the *Bowman/Nixon* standard applies to subpoenas issued by a defendant to the government does not mean that the same standard must apply to subpoenas issued by a defendant to non-parties. Since *Nixon*, courts have held or suggested that the limitation does not apply when the subpoena is issued on behalf of a defendant upon a non-party. *See United States v. Nachamie*, 91 F. Supp. 2d 552 (S.D.N.Y. 2000); *Tomison*, 969 F. Supp. at 593; *United States v. Stein*, 488 F. Supp. 2d 350, 99 (S.D. N.Y. 2007); *Tucker*, 249 F.R.D. at 58. *Bowman Dairy* and *Nixon* neither covered nor considered the broad range of situations in which Rule 17(c) issues arise, including the one here, and the evidentiary standard that they impose should not apply to defendants' subpoenas on non-parties.

In *Nachamie*, the court discussed whether the *Nixon* standard should be used for subpoenas directed at third parties, stating:

> That high standard, of course, made sense in the context of a Government subpoena, especially one seeking evidence from the President . . . A real question remains as to whether it makes sense to require a defendant's use of Rule 17(c) to obtain material from a non-party to meet this same standard. Unlike the government, the defendant has not had an earlier opportunity to obtain material by means of a grand jury subpoena. Because the rule states only that a court may quash a subpoena "if compliance would be unreasonable or oppressive," the judicial gloss that the material sought must be evidentiary—defined as relevant, admissible and specific—may be inappropriate in the context of a defense subpoena of documents from third parties.

*Nachamie*, 91 F. Supp. at 562–63,

12

*Nachamie* relied on *Tomison*, which involved a challenge to a defendant's Rule 17(c) subpoena to a third party. Observing that "[a] criminal defendant has both a constitutional right to obtain evidence which bears upon the determination of either guilt or punishment, and a Sixth Amendment right to [compulsory] process," the court in *Tomison* explained that "Rule 17(c) implements both the right to obtain the evidence and to require its production," *Tomison*, 969 F. Supp. at 593 (citations omitted). Further, the court noted that in cases where the materials sought were "too massive for the defendant to adequately review unless obtained prior to trial, pretrial production through Rule 17(c) is necessary to preserve the defendant's constitutional right to obtain and effectively use such evidence at trial." *Tomison*, 969 F. Supp. at 593 (citations omitted).

Here, the documents and data sought from Cybergenetics are relevant, admissible and specific. The documents and data sought are relevant to the reliability of the TrueAllele's results and deal specifically with forensic bioinformatics with a focus on DNA mixture interpretation, statistical weightings of evidence, probabilistic genotyping, and software development. According to experts in the field, it is not possible to assess or confront TrueAllele's conclusions without a particularized understanding of the analysis it performs. In order to gain a particularized understanding, a request was made to the subpoena directs Cybergenetics to provide technical information relevant to the scrutiny of and reliability of TrueAllele. Software quality is best evaluated against objective descriptions with testable pass/fail criteria for measuring compliance with those descriptions. Various methods

are used by software developers to ensure and evaluate this compliance, and industry and organizational standards documents set forth frameworks for the tasks that should be undertaken during software conceptualization, construction, maintenance, and use. In 2016, the International Society for Forensic Genetics (ISFG) recognized that industry standards such as the Institute of Electrical and Electronics Engineers (IEEE) Standard 1012-2012, *Standard for System and Software Verification and Validation*,[6] "can be simplified and extrapolated to forensic genetics." Neither ISFG nor leading American authorities on forensic DNA mixture interpretation have accomplished such a simplification or extrapolation, so we are left with the principles described in standards such as IEEE Std 1012-2012, which are general to all software products.

IEEE Std 1012-2012 describes several concepts, including "integrity levels" of software systems, which influences the depth and breadth of software verification and validation efforts based on assessments of (1) a software system's propensity for bugs, defects, or errors, and (2) the social and financial consequences of these possible errors. Both of these assessments can and should be rooted in objective assessments of a software system's verification and validation (V&V) efforts. The materials covered by the subpoena were requested due to their relevance to these efforts, both as general software system verification and validation tasks, as well as tasks specific

---

[6] IEEE has more than 400,000 members internationally and over 1,200 active standards. https://www.ieee.org/about/today/at-a-glance.html. Its current organizational structure and mission date back to 1963, and its parent organizations were founded over 130 years ago and have adapted to advances in electrical engineering, radio, electronics, computing, and software. https://www.ieee.org/about/ieee-history.html.

14

to the validation of probabilistic genotyping software systems. Many of the requested materials are referenced repeatedly in IEEE Std 1012-2012's 26-page rubric, "Table 1c-V&V tasks, inputs, and outputs" describing the appropriate tasks to be undertaken for software V&V efforts in accordance with that system's integrity level.

Additionally, the materials specific to PGS validation are described by the extant guidance documents published by organizations such as ISFG or the Scientific Working Group on DNA Analysis Methods (SWGDAM). These materials can be used to evaluate validation of PGS from a criminal forensic laboratory perspective.

The requested case-specific materials are necessary to review and reanalyze what was done in Mr. Ellis's case. There is no transparency around how TrueAllele does what it purports to do, and the defense is entitled to investigate whether it actually does what it is designed to do. Professor Erin Murphy of N.Y.U. School of Law[7]—a nationally recognized expert in forensic DNA typing whose work has been cited multiple times by the Supreme Court—has argued that obtaining the code itself is crucial in order to fully evaluate TrueAllele. She writes, "Just as courts would not accept opinions from witnesses not shown to have qualifications as an expert, so, too, should courts not accept opinions from digital 'experts' without probing the 'qualifications' of the technology."[8]

---

[7] Faculty Biography available at,
https://its.law.nyu.edu/facultyprofiles/index.cfm?fuseaction=profile.biography&personid=31567

[8] Erin Murphy, *Inside The Cell: The Dark Side Of Forensic DNA* 299 (2015).

II.        **Even under the *Nixon* standard, the pre-trial subpoena *duces tecum* was properly issued.**

1. **Evidentiary and relevant.**

Here, the Court should look to Federal Rule of Evidence (FRE) 102 and 702. FRE 102 states: "These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." FRE 702 requires a showing that before an expert's testimony is deemed admissible it must be "based on sufficient facts or data," the "product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." As stated above, the material is relevant and evidentiary because it has a tendency to make a fact more or less probable than it would be without the evidence, and its consequence to determine the validity of and admissibility of TrueAllele. This Court plays a "gatekeeping" role when it comes to expert testimony, "ensur[ing] that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Expert testimony is inadmissible unless it is the "product of reliable principles and methods." Fed. R. Evid. 702(c). Put differently, an ostensibly scientific method like TrueAllele's algorithm for generating LRs is inadmissible unless it is foundationally valid. *Daubert*, 509 U.S. at 593. And the validity can only be scrutinized if the defense has access to the materials sought in the subpoena.

**2.  That they are not otherwise procurable reasonably in advance of trial by exercise of due diligence**

As outlined above, the defense requested these documents and data from the government prior requesting the materials via subpoena. The government stated that it has turned everything over and refuses to produce other materials that remain outstanding.

**3.  That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial**

As stated above, the request seeks specific information needed to examine and assess the accuracy of the TrueAllele results and the methods by which the software analyzes DNA samples/produces a likelihood ratio. If voluminous scientific information needed for expert analysis is not produced prior to trial, delay would be inevitable.

**4. That the application is made in good faith and is not intended as a general "fishing expedition."**

Again, the documents and data requested are specifically tailored to what experts in the field need to assess the reliability and accuracy of TrueAllele and therefore are material to the preparation of the defense. As such, the request was made in good faith.

## CONCLUSION

For all the reasons set forth above, Mr. Ellis asks this Court to deny the government's request to unseal the subpoena as the issue is moot, and order Cybergenetics to respond to the Rule 17 subpoena by a date certain.

Respectfully Submitted,

/s/ Khasha Attaran
Khasha Attaran
Assistant Federal Public Defender