IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
            )
         v.          )     Criminal No. 19-369
            )
LAFON ELLIS            )

## OMNIBUS RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS

AND NOW comes the United States of America, through its counsel, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, and Brendan T. Conway, Assistant U.S. Attorney for said district, and respectfully submits the government's omnibus response to defendant's pretrial motions.  Specifically, the pleading is intended to respond to the following pleadings filed by the defendant:  Motion to Compel Software Verification Materials (ECF No. 83) and Motion to Compel Discovery (ECF No. 97).  This pleading is also designed to comply with this Court's order of August 21, 2020 in which it directed the government to reply to certain items raised in the defendant's response to the government's Motion to Quash,[1] and to an amicus brief attached to the defendant's Motion to Compel Software Verification Materials (ECF No. 83, Exhibit 3).

## I.    FACTUAL BACKGROUND

By way of background, on August 21, 2018, the Pittsburgh Bureau of Police (PBP) was searching for a vehicle involved in a homicide.  They spotted the vehicle, observed the defendant as the driver, noted some traffic violations, and attempted to stop the vehicle.  Ellis was the driver

---

[1] Specifically, the Court wrote: "Defendant has filed a Response [ECF No.] 71 to the Government's Motion to Quash [ECF No.] 47. Therein, at Paragraph 23, Defendant identifies materials still sought and allegedly unproduced. In addition, at p. 8, fn 4, Defendant proposes several modifications to the subpoena at issue. The Government shall file a Reply to Defendant's Response, addressing each item identified in Paragraph 23 and each proposed modification, by September 9, 2020" (ECF No. 91). The deadline for submitting that response was extended to October 14, 2020 by order dated August 26, 2020 (ECF No. 94).

and sole occupant, and he led the police on a high speed chase that resulted in him crashing the vehicle he was operating.  He fled on foot, and the police were not able to catch him.  The police chase and the defendant fleeing from the crashed vehicle was captured on dash camera video provided to the defense.  A search of the vehicle revealed, among other things, a firearm on the driver's side near the brakes and accelerator.  Later DNA testing revealed Ellis's DNA on the gun.

The DNA testing was conducted by a company called Cybergenetics, and it was analyzed through its TrueAllele software.  Although originally charged by the Pittsburgh Bureau of Police and the Allegheny County District Attorney's office, the government subsequently agreed to prosecute the matter.  Ellis has prior convictions as an adult for aggravated robbery (two counts), burglary, and illegal gun possession, and the Grand Jury returned an indictment charging him with violating 18 U.S.C. § 922(g)(1).  At the arraignment in this matter, the government provided the defendant with extensive discovery, including a voluminous amount of materials related to Cybergenetics and the TrueAllele software.  For each case, Cybergenetics prepares a DVD of the relevant material, which includes not only case-specific information, but also tutorials about the process, links to validations studies, and all sorts of other information (*See* Exhibit A).  The government provided the defense with that DVD, and it is also providing the Court a copy of the DVD under separate cover.  Cybergenetics also has a publicly available website, https://www.cybgen.com/, to which the government referred the defense that provides a great deal of information about the company and its methodology.

The government has supplemented that initial discovery production with further production and made all of the discoverable evidence in counsel for the government's possession available for inspection.  Included in the items provided in the discovery are all materials provided by Cybergentics to the Allegheny County District Attorney's Office, which includes its report and the

resume of the expert, dash camera video, photographs from the scene, photographs from the forensic team, reports of the incident, search warrants for Ellis' DNA, CAD sheets and a report from the incident and from an incident in which the defendant's girlfriend falsely claimed that the vehicle Ellis was driving was stolen, the defendant's video-taped statement to law enforcement, certified copies of the defendant's convictions, the defendant's criminal history, and various other materials.

## II.     PROCEDURAL BACKGROUND

In violation of numerous provisions of Federal Rule of Criminal Procedure 17 and by filing *ex parte* pleadings under seal without justification or leave of the Court, defense counsel provided subpoenas to Cybergenetics, the Allegheny County District Attorney's Office, and the Pittsburgh Bureau of Police.  The government filed a Motion to Quash the subpoena to Cybergenetics (ECF No. 47) and the Allegheny County District Attorney's Office filed a Motion to Quash the subpoena defense counsel issued to it (ECF No. 52).  The defendant filed a response to the government's motion to quash (ECF No. 71) and a supplement to that response (ECF No. 81).  The defendant also responded to the motion to quash filed by the Allegheny County District Attorney's Office (ECF No. 82) in which the defendant conceded that modifications to the subpoena were warranted. The Court has not ruled on the government's motion to quash, but did direct the government to reply to certain aspects of the defendant's response (ECF No. 91).  The Court has granted in part and denied in part the Allegheny County District Attorney's Office Motion to Quash and required the government and the Allegheny County District Attorney's Office to file a supplemental response (ECF No. 105).

III.    MOTION TO COMPEL SOFTWARE VERIFICATION MATERIALS

In his motion to compel software verification materials, the defendant completely misses the point of what is at issue here, which is whether Cybergentics and its TrueAllele software produces reliable results.  As the defendant seems to concede, the results of the TueAllele software have been tested over and over again.  The government has provided the defense with a DVD that contains that testing.  It has been the subject of peer-reviewed articles and found to be reliable by every court to consider its admissibility.  TrueAllele has been used in over 850 criminal cases, with expert witness testimony given in over 90 trials.  TrueAllele results have been reported in 44 of the 50 states, including in Pennsylvania. Both prosecutors and defenders use TrueAllele for determining DNA match statistics.  TrueAllele is also used by innocence projects and for post-conviction relief.  TrueAllele's reliability has been confirmed in appellate precedent in Nebraska, New York, and Pennsylvania.  *See State v. Simmer*, 935 N.W.2d 167 (Neb. 2019); *People v. Wakefield*, 47 Misc.3d 850, 9 N.Y.S.3d 540, 2015 N.Y. Slip Op. 25037 (N.Y. Supreme Ct. 2015) ("Cybergenetics TrueAllele Casework software, which uses a fully continuous probabilistic approach and is one of, if not, the most advanced method of interpreting DNA profiles from mixed and low-template DNA, is generally accepted as reliable by the scientific community[.]"); and *Pennsylvania v. Foley*, 38 A.3d 882 (Pa. Super. Ct. 2012) ("Here, we find no legitimate dispute regarding the reliability of . . . proprietary software called TrueAllele to interpret the data . . . received").

There is no genuine controversy as to the validity and reliability of the TrueAllele method. The TrueAllele calculation is entirely objective: when it determines the genotypes for the contributors to the mixture evidence, the computer has no knowledge of the comparison genotypes. Genotype comparison and match statistic determination are only done after genotypes have been

4

computed.  Moreover, the computer uses all the data, without user intervention.  In this way, TrueAllele computing avoids human examination bias, and provides a fair match statistic.

Over thirty-five validation studies have been conducted by Cybergenetics and other groups to establish the reliability of the TrueAllele method and software.  Eight of these studies have been published in peer-reviewed scientific journals, for both laboratory-generated and casework DNA samples.  The government provided links to the defense of those validation studies.

The defendant argues that TrueAllele is a novel and highly criticized technology. However, the TrueAllele software has been admitted into courts, found reliable, and declared to not be a novel scientific technique.  A Pennsylvania appellate court upheld admission of testimony based on the interpretation of TrueAllele data against a challenge that it did not meet the Frye standard. *Commonwealth v. Foley*, 38 A.3d 882, 890 (Pa. Super. Ct. 2012). The *Foley* court held the defendant failed to establish the existence of a legitimate dispute over the TrueAllele system and failed to show that the testimony constituted novel scientific evidence. *Foley, supra,* at p. 890.

The TrueAllele software is not novel. In *People v. Wakefield*, the defendant challenged the trial court's Frye ruling that TrueAllele was generally accepted by the relevant scientific community and not novel. The *Wakefield* court found the trial court's ruling proper and cited forensics journals, validation studies, peer reviewed publications, and the New York State Forensic Science Commission's binding recommendation that TrueAllele be used by the State Police to show its reliability, historic use, and effectiveness. *People v. Wakefield*, 47 Misc.3d 850, 9 N.Y.S.3d 540, 2015 N.Y. Slip Op. 25037 (N.Y. Supreme Ct. 2015).  In fact, TrueAllele results have become so unquestionably reliable that some defendants, at least in Pennsylvania, have stopped challenging them on appeal. *See Commonwealth v. Long*, No. 1432 WDA 2017, 2020 WL 603869, at *3 (Pa. Super. Ct. Feb. 7, 2020).

Despite the settled law related to the validity of the TrueAllele software, the defendant seeks thirty or so categories of information related to the development of the software. The categories range from everything from the "source code" that is the subject of the pending motion to quash, to "Change logs", "version control system history", "server-side database and executable computing components", "design description", and all sorts of other nonsense.

What matters here is whether the software produces reliable results that can be and have been validated. The exact code used, the person who wrote that code, and all of the other material sought by the defense is not what is important. In this case, there is really no dispute that the TrueAllele software has been tested and it is reliable. The issue is not that it is reliable; the issue is that it demonstrates that the defendant is guilty. Thus, the Court should deny the motion because, as discussed in more detail below and in the government's Motion to Quash, the information sought is not discoverable under any legal theory.

### a.  Brady does not require the production of the materials.

The defendant's initial argument is that *Brady v. Marland* and it progeny require that the government produce the relevant materials. If *Brady* in fact did require the production of those materials, one would think that in the decade that Courts have admitted expert testimony related to the results of the TueAllele software that some Court would have agreed with defense counsel. Tellingly, the defendant failed to cite to any case in which a Court agreed with the defendant's argument. In fact, every court that analyzed whether Cybergenetics should have to reveal its source code has determined that it does not except for the one case discussed in the footnote. [2] In

---

[2] Recently, a Court in Virginia issued an Order compelling Cybergentics to produce its source code. In that case, however, the prosecution did not file a motion to quash, as the government did here. Thus, Cybergenetics was forced to hire its own counsel at its own expense, and that counsel filed a motion for reconsideration. That motion for reconsideration is attached hereto as Exhibit B, and the arguments and exhibits to the motion are incorporated herein as if set forth in full.

*Commonwealth v. Knight*, No. 379 WDA 2017, 2017 WL 5951725, at *6 (Pa. Super. Ct. Nov. 29, 2017), Pennsylvania's Superior Court held that "the source code for TrueAllele was not material to Appellant's defense and his request to compel its production was not reasonable[.]"  The Court reasoned that, "scientists can validate the reliability of a computerized process even if the 'source code' underlying that process is not available to the public." (quoting *Foley*, 38 A.3d at 889).

In *Commonwealth v. Robinson*, the court rejected defendant's discovery request for the source code. *Commonwealth v. Robinson*, 2016 Pa. D. & C. Dec. LEXIS 21764 (Allegheny Co. Ct of Common Pleas Feb. 4, 2016) (attached as Exhibit A to ECF No. 47). The court found the source code was not material to the defendant's ability to pursue a defense. *See also Commonwealth v. Arganda*, CC No. 201317748 (Allegheny Co. Ct. Common Pleas June 8, 2016) (attached as Exhibit B to ECF No. 47) (denying motion for reconsideration of order granting motion to quash subpoena for TrueAllele's source code).  Similarly, the court of *People v. Superior Court (Chubbs)* held that the source code was not necessary to judge the software's reliability and that defendant had not made a prima facie showing of the particularized need for the code. *People v. Superior Court (Chubbs)*, 2015 WL 139069 (Cal. Ct. App. January 9, 2015). *See also Washington v. Fair*, Case No. 10-1-09274-5 SEA (Super. Ct. of Wa. for King Co. 1/12/1017) (attached Exhibit C to ECF No. 47) (denying motion to compel disclosure of TrueAllele's source code); *Ohio v. Shaw*, Case. No. CR-13-575691 (Oh. Ct. of Common Pleas Cuyahgo Co. Oct. 9, 2014) (attached as Exhibit D to ECF No. 47) (denying motion to compel production of TrueAllele's source code and concluding that "the TrueAllele methodology and the State's witnesses are reliable without the use of the source code.").

Counsel for the government is well aware of the government's obligations under *Brady* and it progeny and has and will continue to comply with those obligations.  If there was something

that the government knew that detracted from the reliability of the TrueAllele's DNA finding in this case, counsel for the government would have already disclosed that information to the defendant.  From what counsel for the government can tell, however, TrueAllele is extremely reliable as Court after Court has determined.  Thus, to the extent that the defendant relies on *Brady* and its progeny as the basis for seeking relief, the Court should deny the motion.

### b. Federal Rule of Criminal Procedure 16 does not require production of validation materials.

Perhaps recognizing the futility of his argument that *Brady* required production of the validations materials, the defendant frivolously argues that Federal Rule of Criminal Procedure 16 requires production of the materials sought.  He is wrong, which is clear from his inability to cite the Court to a single case in the history of the courts' admission of results from TrueAllele where a court compelled production of these materials pursuant to Rule 16 or any other rule or Constitutional principle.  The government has more than met its Rule 16 obligations by making its entire case file available for review, by making the physical evidence available for inspection, and by providing extensive expert witness disclosures.  It has provided the resume of its expert witness, the reports of its expert, and an entire DVD with all sorts of information about the process used to produce the report.

First, Rule 16(a)(1)(E) requires the government to make items available to the defense if the items are within the government's "possession, custody, or control."  Despite the defendant's protestation to the contrary, none of this material is within the possession, custody or control of the government.  The sought after materials are exclusively in the possession of Cybergentics and protected by trademarks.  Cybergenetics is a private company that any party can hire to perform services.  The government does not control Cybergenetics and it does not have access to the materials sought by the defense. *See United States v. Ian Norris,* 753 F.Supp.2d 492, 529-531

(E.D. Pa. 2010), *aff'd,* 419 F. App'x 190 (3d Cir. 2011) (noting the defendant cannot compel the government to disclose material that the government does not have requisite control of that material). More specifically, before the Court should grant a motion to compel in this context, the Court must determine:

> (1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence.

*Id.* at 530 (citations omitted). In the instant matter, Cybergenetics, as noted, is acting in cooperation with the government in that it is providing a product (DNA laboratory testing and analysis), however, Cybergenetics certainly does not represent the government and is not under its control. Cybergenetics is not a part of the government's team and is not sharing resources. Finally, the government most definitely does not have "ready access" to this evidence. Understandably, Cybergenetics is in no way ready to provide its trademarked material to any entity, including the government. Thus, Rule 16(a)(1)(E) cannot compel production by the government of something that is not in its possession, custody or control. *See also, United States v. Sarras*, 575 F.3d 1191, 1215 (11th Cir. 2009) (no disclosure required because neither records possessed by medical provider not computers possessed by victim or her family were within the government's possession).

Even if this material were in the government's possession, custody or control, the government must only make the material available for inspection, if the item is "material to preparing the defense" or if "the government intends to use the item in its case-in-chief at trial." The government does not intend to use the materials sought by the defendant in its case-in-chief. It intends to present the test results from its expert, which have been disclosed.

As for items "material" to the defense, materiality generally requires "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of evidence in his favor." *United States v. Caro*, 587 F.3d 608, 621 (4th Cir. 2010).  As Judge Conti recently held:

> Materiality to the preparation of the defense within the meaning of this rule means "more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would ... enable the defendant significantly to alter the quantum of proof in his favor." *United States v. Maniktala,* 934 F.2d 25, 29 (2d Cir.1991); *United States v. Buckley,* 586 F.2d 498, 506 (5th Cir.1978); *United States v. Boffa,* 89 F.R.D. 523, 535 (D.Del.1981). In other words, materiality is based upon whether there is a reasonable probability that the production of the evidence would affect the outcome of the trial. *United States v. Savage,* No. 07–550–03, 2013 WL 420299, at *3 (E.D.Pa. Feb.4, 2013) (citing *United States v. Perdomo,* 929 F.2d 967, 971 (3d Cir.1991); *United States v. Garcia,* No. 99–064, 2001 WL 173784, at *2 n. 8 (D.Del. Feb.13, 2001)).

*United States v. House*, 2015 WL 6134031, at *3 (W.D. Pa. Oct. 16, 2015).  The defendant bears the burden of making a "threshold showing of materiality, which requires a presentation of facts which would tend to show that the government is in possession of information helpful to the defense." *United States v. Stever*, 603 F.3d 747, 852 (9th Cir. 2010).  In this case, the defendant has not met his burden.  He is hoping that an expert's review of this verification material will lead to something he could use to refute the reliability of the results, but hope is not evidence.  Thus, Rule 16(a)(1)(E) is not a basis for requiring the government to disclose the information sought by the defense.

The defendant next turns to Rule 16(a)(1)(F), which requires the government to produce the "**results or reports** of any . . . scientific test or experiment" (emphasis added).  The language of Rule 16(a)(1)(F) is clear, unambiguous, and limited to reports of examinations and tests. *See United States v. Price*, 75 F.3d 1440, 1444-45 (10th Cir. 1996) (upholding denial of request for production of "the underlying bases of the government chemist's conclusion that the substances he

tested were methamphetamine," information relating to the reliability of the chemist's equipment, and "evidence of the chemist's credentials") (also citing *United States v. Dennison*, 937 F.2d 559, 565–66 (10th Cir.1991) (Rule 16 pretrial disclosure limited to reports of examinations and tests); *United States v. Alex*, 791 F.Supp. 723, 729 (N.D. Ill. 1992) (although defendant was entitled to disclosure of scientific tests and expert reports generated by the government's expert witnesses, the government was not required to disclose facts and data underlying expert opinions); *United States v. Iglesias*, 881 F.2d 1519, 1523–24 (9th Cir.1989); *United States v. Orzechowski*, 547 F.2d 978, 983–85 (7th Cir.1976) (government not required under Rule 16 to produce internal memoranda of DEA in relation to tests necessary for determining whether a substance was an unlawful isomer of cocaine); *United States v. Bear*, 2009 WL 917593, at *2 (D.S.D. Mar. 31, 2009) (results and reports are conclusions and discoverable under Rule 16(a)(1)(F), but the "raw material" used to reach those conclusions are not).

Specifically, in *United States v. Iglesias*, among other things, the defendant sought to compel the production of "[a]ll documents associated with any scientific analysis of any controlled substance seized or otherwise obtained in the course of any investigation leading to or otherwise associated with the prosecution of this case. This request includes but is not limited to those records memorializing the storage and transportation of any such substance from the time of seizure or acquisition and thereafter up to and including the trial in this matter." 881 F.2d at 1521. In response, the government provided a DEA lab report and offered to arrange a call between defense counsel and the chemist, but specifically declined to produce "log notes," protocols and other internal documents. *Id*. The Ninth Circuit Court of Appeals carefully analyzed the defense request in light of the precise language of Rule 16 regarding "results" or "reports." While the Court conceded that materials like the chemist's log notes could allow for a more effective defense, it

found "no legal duty under [Rule 16] to turn over such informal internal documents." *Id*. at 1523.

"While we certainly respect defendants' rights to inspect and copy the actual results or reports of

scientific tests, we are not willing to force the government to disclose every single piece of paper

that is generated internally in conjunction with such tests." *Id*. at 1523-24. The Ninth Circuit

concluded, "[i]f we were to reverse the district court and compel the government to turn over the

internal documents to Iglesias, this would violate both the plain meaning and the spirit of Rule

16(a)(1)(D), and also would place unreasonable burdens on the government in future cases."

*Iglesias*, 881 F.2d at 1524.

The defendant next cites Rule 16(a)(1)(G) and Federal Rules of Evidence 702 in support

of his position that the Court should order the government to produce the sought-after materials.

Rule 16(a)(1)(G) requires the government to make an expert witness disclosure that includes, "the

witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."

The government fully complied with this rule because it provided the defendant with the

resume of its expert, a report of her results, and an entire DVD with five folders.  The first folder,

entitled "Reliability," contains the materials provided for TrueAllele admissibility hearings,

including reading material describing how TrueAllele works, its methods, how it has been

validated, how it complies with regulatory guidelines, and how it has been used.  There is even a

Power Point presentation that provides much of that same information.  The next folder is entitled,

"Validation", and this folder includes thirty-seven TrueAllele validation studies, including the

seven peer-reviewed validations, with a list of citations and table of information. Validation data,

presentations, and other validation information is also included.  The next folder is entitled,

"Tutorials", and this folder contains several video files containing lectures covering the theory and

usage of the TrueAllele System.  The next folder is entitled "VUIer", and it contains installation

instructions, installers, license key and other information regarding the Visual User Interface (VUIer™) and TrueAllele software. The final folder on the DVD is entitled "Case files" that includes case specific files such as sequencer files, TrueAllele report, case packet, demonstrative aid, curriculum vitae, and other miscellaneous case files as well as VUIer files that allow others to review the TrueAllele results for a case. Among those materials, and attached hereto as Exhibit D, is an entire power point presentation explaining the bases for the opinion expressed by the expert. As if that disclosure were not enough, Cybergenetics has a publicly available website that provides yet more information, and counsel for the government referred defense counsel to that website. In terms of expert disclosures, it is difficult to imagine a more comprehensive disclosure than what Cybergenetics has provided this defendant.

Under these circumstances, there is no cogent argument that the government has not met its expert disclosure obligations. There is no question that the government has summarized the expert's opinion and provided the expert's qualifications. And even a cursory review of Exhibit D and the material on the DVD , which the government is providing to the Court under separate cover, makes it absolutely crystal clear the basis for the expert's opinions. The defendant, of course, cites the Court to no authority for the proposition that the government must disclose the long list of validation materials and no Court has ever required either the government or Cybergenetics to make the requested disclosures when contested. Thus, the Court should deny the motion to the extent that it is based on Rule 16 or Rule 702.

### c. The Confrontation Clause does not require production.[3]

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution provides that

---

[3] The defendant also cites to the Due Process Clause as a basis for requiring production, but, as far as counsel for the government can tell, the actual arguments are based on *Brady* (addressed above) and the Confrontation Clause (addressed in his section).

"[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." A defendant's confrontation rights are implicated by the admission of a "testimonial" statement by a witness absent from trial, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see also Davis v. Washington*, 547 U.S. 813, 823-24 (2006) (holding that Confrontation Clause does *not* prohibit the admission of non-testimonial hearsay).

Ellis invokes the Confrontation Clause in an attempt to obtain disclosure of TrueAllele's "software verification and validation materials," including the source code, claiming that "failure to disclose such materials violations Mr. Ellis's Sixth Amendment right to confront the evidence against him." Mot. to Compel at *11-12; *see also* Amicus Br. at *4. But the Confrontation Clause does not provide a right to confront *evidence*—it guarantees the right to confront *witnesses* through cross-examination at trial. *See Crawford*, 541 U.S. at 61-62 (explaining that the Clause is "a procedural … guarantee" that "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination"). TrueAllele and its source code cannot be considered "witnesses" within the meaning of the Confrontation Clause because they are not subject to cross-examination. *See United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) ("If the readings [from a scientific instrument] are 'statements' by a 'witness against' the defendants, then the machine must be the declarant. Yet how could one cross-examine a gas chromatograph? Producing spectrographs, ovens, and centrifuges in court would serve no one's interests."). An appellate court in New York State has rejected just such an argument in the context of the TrueAllele software program. *See People v. Wakefield*, 175 A.D.3d 158 (N.Y. App. Div. 3d Dep't 2019) (even if DNA analysis *report* from TrueAllele software program was testimonial, that did not "transform the source code into a declarant" within the meaning of the

14

Confrontation Clause).  As the court held in that case, the Confrontation Clause guarantees the right to cross-examine the *person* who presents the TrueAllele test results, not the software itself.

Nor can the source code, or any other validation materials, be considered a "testimonial" statement within the meaning of the Confrontation Clause.  A statement is ranked as testimonial if its "primary purpose" is to relay information potentially relevant to a later prosecution.  *See Davis*, 547 U.S. at 822; *see also Michigan v. Bryant*, 562 U.S. 344, 358, 361 (2011).  To be sure, forensic reports "prepared in connection with a criminal investigation or prosecution" have been deemed "testimonial" and generally must be admitted through the certifying analyst, who is subject to cross-examination.[4]  *Bullcoming v. New Mexico*, 564 U.S. 647, 658-59 (2011) (forensic laboratory report certifying defendant's blood-alcohol concentration based on the result of a gas chromatograph machine was testimonial); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (forensic laboratory report stating that particular substance was tested and found to contain cocaine was testimonial).  But statements or records *not* prepared for use in a particular criminal investigation or prosecution cannot be classified as testimonial.  This includes, for example, "documents prepared in the regular course of equipment maintenance." *Melendez-Diaz*, 557 U.S. at 311 n.1, and raw data or physical evidence underlying a forensic report, *see Wilson v. Collins*, 517 F.3d 421, 431 (6th Cir. 2008); *United States v. Zimmerman*, 514 F.3d 851, 855 (9th Cir. 2007); *cf. Schmerber v. California*, 384 U.S. 757, 765 (1966) (holding that "blood test evidence, although

---

[4] *Bullcoming* indicates that a forensic report may also be introduced through a person other than the certifying analyst if the witness "personally perform[ed] or observe[d] the performance of the test reported in the certification."  *Id.* at 657.  In *Williams v. Illinois*, 567 U.S. 50 (2012), a plurality of the Supreme Court concluded that the admission of an expert's independent opinion testimony relying on reports prepared by others comports with the Confrontation Clause, *id.* at 57-61, and even the dissent agreed that an expert could apply her knowledge to raw data supplied by others, *id.* at 129.

an incriminating product of compulsion, [is] neither ... testimony nor evidence relating to some communicative act or writing" and is therefore not protected by the Fifth Amendment).

Here, the materials sought by Ellis are nontestimonial.  The source code and "validation materials" were prepared in the usual course of business over more than twenty years, not in connection with Ellis's prosecution.  *See State v. Lindner*, 252 P.3d 1033, 1035-36 (Ariz. Ct. App. 2010) (no Confrontation Clause violation from denial of right to cross examine someone on quality assurance, maintenance records, and source code of breathalyzer equipment because they were not "created … for use against a specific criminal defendant"); *see also State v. Appleby*, 221 P.3d 525, 551 (Kan. 2009) (database of DNA profiles was comprised of "physical, nontestimonial evidence" and "the acts of writing computer programs that allow a comparison of samples of physical evidence or that calculate probabilities of a particular sample occurring in a defined population are nontestimonial actions").  TrueAllele is a neutral software program, used in nearly a thousand cases by both prosecution and defense.  Because the TrueAllele source code is nontestimonial, denial of access to the source code does not implicate Ellis's rights under the Confrontation Clause.

Finally and importantly, the Third Circuit recently held that the right to confrontation is a "trial right," and cannot serve as a "constitutionally compelled rule of pretrial discovery."  *United States v. Fattah*, 914 F.3d 112, 179 (3d Cir. 2019) (quoting and adopting plurality opinion in *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987)).  As such, the Confrontation Clause is not implicated by the denial of pretrial discovery regardless of the nature of the evidence in question. Indeed, a California court of appeals has held that a trial court abused its discretion in relying on the confrontation clause as a basis to order disclosure of TrueAllele source code. *See People v.*

*Superior Court (Chubbs)*, No. B258569, 2015 WL 139069, at *9 (Cal. Ct. App. Jan. 9, 2015) (unpublished).

But even if the Confrontation Clause could be stretched to require pretrial discovery—a premise directly rejected in *Fattah*—the defense in this case has already been provided with everything required to assess the reliability of TrueAllele and to effectively cross-examine whatever witness presents the DNA testing results. This Court should not stretch the Confrontation Clause beyond recognition to require disclosure of materials outside the scope of criminal discovery.

## IV.    RESPONSE TO AMICUS BRIEF

Attached as an Exhibit to the defendant's Motion to Compel Software Verification Materials is an amicus brief. To the extent that the defendant adopted the arguments contained in the amicus brief, those arguments are addressed above. There are a few arguments that even the defendant did not adopt, and those are addressed below. They are unavailing.

### a.    There is no public right of access to raw discovery materials, and any analysis of the First Amendment implications of Ellis's request would be premature.

Amici spend more than ten pages of their brief arguing that the government's motion to quash should be denied to "protect" the public's First Amendment right of access to TrueAllele's source code and information about the algorithms it uses. Amicus Br. at *12-22. But as amici appear to acknowledge, no right of access has attached to any such information. *See* Amicus Br. at *14 ("Assuming that this case will proceed to trial, there is little question that the right of access will attach." (emphasis added)). Even if the source code or other confidential materials were to be made available to the defense, it is well established that there is no First Amendment or common law right of access to "the 'raw fruits' of discovery." Amicus Br. at *21; *see N. Jersey Media Grp. Inc v. United States*, 836 F.3d 421, 430 (3d Cir. 2016). Only if discovery material is introduced at

trial or filed in connection with a substantive (i.e., non-discovery) motion—and only if a party seeks to keep that material sealed—will the court need to determine whether there is a presumptive right of access.  *See N. Jersey Media Grp.*, 836 F.3d at 433-34, 436; *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 164 (3d Cir. 1993).  The present dispute concerns the scope of discovery; it does not concern a courtroom closure or even sealed filings on the docket.  Any ruling at this juncture on whether there is a public right of access to source code, or anything else, would be premature.

While the court need not (and should not) reach the issue, the government notes that amici's position on the scope of the First Amendment right of access is extreme and unprecedented.  Amici make the sweeping claim that a presumption of access extends to "all materials essential to [trial]— including the algorithmic source code in this case," apparently without regard to whether the source code is actually introduced at trial.  *See* Amicus Br. at *14-15.  But its own cases make clear that any presumption of openness attaches only once material is actually admitted into evidence at trial or submitted to the court in connection with a substantive motion.  *See Doe v. Pub. Citizen*, 749 F.3d 246, 267 (4th Cir. 2014) (finding a presumptive right of access to motions for summary judgment and "materials filed in connection with" those motions, the judicial opinion adjudicating the motions, and the docket sheet); *Application of WFMJ Broad. Co.*, 566 F. Supp. 1036, 1040 (N.D. Ohio 1983) (declining to provide prior access to tapes that prosecutors intended to play at trial because "[i]t is the tapes' admission into evidence and their presentation to the jury and observing members of the public which gives rise to the broadcasters' right to copy and further broadcast the tapes."); *see also* Amicus Br. at 15 n.16, 20 (citing various cases finding a right of access to materials admitted into evidence or offered in open court).  Simply put, unless and until

discovery material is placed into the record by the parties in an otherwise-public proceeding, any potential public right of access to the material does not attach.

Amici also rely heavily on *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), *see* Amicus Br. at *15, but that case is inapposite. Woodford was a dispute over the scope of public access to state executions—specifically, whether the public had a right to view the "initial procedures" prior to the actual administration of a lethal injection. Here, by contrast, there is no dispute that a presumption of access will attach to any future trial, as well as certain pretrial proceedings. Amici nonetheless attempt to analogize to *Woodford* on the basis that "without access to algorithms that create material evidence, the public will be forced to rely" on the government's assurances that TrueAllele is trustworthy. Amicus Br. at *15. But that is not true. Ellis, through counsel, has available to him all of the information necessary to test the accuracy of TrueAllele—including the core mathematics of its underlying model, validation studies, and an opportunity to assess reliability by testing the TrueAllele program on actual data— and may further explore any concerns through cross-examination at trial. The public has no greater right to the source code than Ellis himself. And the public's right of access to a criminal trial does not extend to material never presented to the jury or court.

Even where there is a presumption of access, the public's interest in openness may be overcome by a need for continued confidentiality. *See United States v. Smith*, 776 F.2d 1104, 1112 (3d Cir. 1985). Notably, the Third Circuit has held that "the presence of trade secrets in court records weighs against the right of access," and that "bone fide trade secrets," public dissemination of which would cause competitive harm, may properly be filed under seal pursuant to a protective order. *Leucadia*, 998 F.2d at 166-67. In the unlikely event that either party finds it necessary to

present source code or other confidential material in a substantive motion or at trial, then, the Court

may be called upon to conduct this analysis.  But it would be premature to do so now.

### b. Any protective order over raw discovery materials need not be narrowly tailored to comport with the First Amendment.

To the extent the court is inclined to enforce the subpoena seeking the TrueAllele source

code—and it should not, for all the reasons explained previously—Cybergenetics, the trade secret

owner, should be given an opportunity to be heard.  *See* 18 U.S.C. § 1835(b).  And any access to

the source code should be subject to a stringent protective order that protects the trade secret

owner's interest in secrecy and eliminates the risk of unauthorized copying or transmission.  *See,*

*e.g.*, Local Patent Rules, U.S. District Court for the Western District of Pennsylvania, Appendix

LPR 2.2 (Model Protective Order) (designating "Source Code Information" as the most sensitive

category of information, and providing strict rules for its inspection and handling), available at

https://www.pawd.uscourts.gov/sites/pawd/files/Local%20Patent%20R%20-%2012-5-2015.pdf.

Amici argue that any protective order must be justified by "on-the-record findings" that satisfy

"strict scrutiny."  Amicus Br. at 24-25.  But this argument assumes that the information is subject

to a public right of access in the first instance.  Again, this dispute concerns Ellis's right to

discovery; it does not concern a courtroom closure or sealed filings on the public docket.  To the

extent Ellis is given access to the source code in discovery, the accompanying protective order

need not be narrowly tailored to protect public access because there is no right of public access to

raw discovery.  *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 782 (3d Cir. 1994) ("[W]hen

a court enters an order of protection over documents exchanged during discovery, and these

documents have not been filed with the court, such documents are not, by reason of the protective

order alone, deemed judicial records to which the right of access attaches.").  As explained above,

only if the source code or other confidential material is admitted under seal in an otherwise-public

proceeding will the court need to determine whether there is a presumption of public access and whether it is outweighed by the need for secrecy. This is an issue that the court should not attempt to resolve at this juncture, as it is purely hypothetical. As the arguments set forth in the amicus brief are just as unavailing as the arguments in the defendant's motion, the Court should deny the defendant's motion.

## V.      REPLY TO DEFENDANT'S RESPONSE TO MOTION TO QUASH

As set forth above, the government filed a Motion to Quash a subpoena issued by defense counsel for at least ten reasons. The defendant responded to that motion and supplemented that response. The issues related to the government's Motion to Quash and the defendant's Motion to Compel Software Verification Materials are very much intertwined, and the same reasons support the Court's denial of the defendant's Motion to Compel Software Verification Materials and the granting of the government's Motion to Quash. The government will address a number of points raised in the defendant's pleadings, but will first address two items that the Court directed the government to address.

First, the Court directed the government to address defendant's assertion, at Paragraph 23 of its response (ECF No. 71), that he has sought certain materials and the government has not produced those materials. The defendant is correct that the defendant sought and the government has not produced those materials. Those materials are the same materials that are the subject of the defendant's Motion to Compel Software Verification Materials. As discussed above, the government has not produced that material because that material is not discoverable under any legal theory and because the government does not have custody or control of the material. The material is in the custody and control of Cybergenetics, it is protected by trademarks, and, as

discussed more fully in the government's Motion to Quash, the material is not necessary to test the validity of the DNA results.

Second, the Court directed the government to address each of the defendant's proposed modifications to the subpoena issued to Cybergenetics.  The first proposed modification to the subpoena is the elimination of the demand for statements of witnesses or prospective witnesses. This modification is required because, as set forth in the government's Motion to Quash, Rule 17 does not authorize the disclosure of witness statements.  Thus, this concession is merely an acknowledgment that the defendant's original subpoena was overbroad and did not comply with Rule 17.

The second proposed modification is to expand the date for compliance from two weeks to four weeks.  Frankly, the government is not sure what would be a reasonable deadline for a response to the subpoena, and government presumes that the deadline for disclosure would very much depend on the extent of the required disclosures.  If, for example, the Court ordered production of the source code, presumably the Court would direct that production be done pursuant to some sort of protective order that would have to be negotiated.[5]  Thus, the Court would likely have to set a production schedule only after resolving that anticipated dispute.

The third proposed modification of the subpoena proposes to require the production be made to the Court and not to defense counsel.  Once again, this modification is just an acknowledgment that the original subpoena issued by defense counsel improperly required the

---

[5] For example, ad disclosed ot the defense on the DVD, Cybergenetics already makes it source code available to opposing experts, but only under certain conditions. *See* Exhibit C.  Presumably, the defendant is unwilling to comply with those conditions because he has not gotten the materials. Thus, if the Court would decide to require Cybergenetics to produce the source code, the Court would then have to decide under what conditions, which would lead to another whole round of litigation that would be avoided if the Court were to agree with every other Court that has addressed this issue.

production to him, which is contrary to Rule 17. Thus, this modification merely modifies the subpoena to bring it in compliance with Rule 17.

The final proposed modification limited the requested items to the items listed in ¶ 23 of the defendant's response to the Motion to Quash. This modification does nothing to resolve the dispute because the items listed in ¶ 23 of the defendant's response to the Motion to Quash are the items most in dispute. In fact, those are the items that are the subject of the defendant's Motion to Compel Software Verification Materials. Thus, the defendant's proposed modifications to the subpoena really do nothing to resolve the dispute because they amount to nothing more than concessions that make the subpoena compliance with Rule 17 and focus the controversy on the items most in dispute.

In addition to addressing the items the Court directed the government to address, there are a number of other issues set forth in the defendant's reply that warrant a response. Those points are addressed in turn below.

### a. The government has standing to challenge the subpoena.

The defendant argues that the motion to quash should be denied without reaching the merits, contending that the government lacks standing. *See* Response to Motion to Quash at *9-10. He is wrong. "A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982) (citing *In re Grand Jury*, 619 F.2d 1022, 1027 (3rd Cir. 1980)). As an initial matter, the subpoena requires the costs to be borne by the government. It is difficult to imagine how the defendant can both request that the costs be borne by the government and simultaneously claim that the government lacks standing to object to the subpoena.

Moreover, Courts have found that the prosecution has standing to move to quash a defendant's third-party subpoena in a criminal case because it "has a legitimate interest in preventing [the defendant] from using a subpoena to obtain discovery materials that would otherwise be protected from disclosure." *United States v. Vasquez*, 258 F.R.D. 68, 71–72 (E.D.N.Y. 2009) (citing *United States v. Louis*, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005)). Courts have also confirmed the government's standing to challenge a third-party subpoena for reasons such as "preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on [a witness's] credibility." *Raineri*, 670 F.2d at 712; *see also, e.g.*, *United States v. Orena*, 883 F.Supp. 849, 869 (E.D.N.Y. 1995).

As explained in greater detail above, the defendant is using a subpoena to obtain materials that fall well outside the appropriate scope of criminal discovery under Rules 16 and 17. He seeks the Court's imprimatur to embark on a fishing expedition to review the equivalent of eight banker's boxes of source code, without putting forth any reason to believe that he will catch any fish. The defendant's expert—who, the government has learned, does not actually read the coding language used in the TrueAllele software—concedes that this review will take a *minimum* of 6-8 weeks with "no practical upper bound to a time estimate for review." Response to Motion to Quash at *35. The government has a legitimate interest in preventing Ellis from abusing the discovery process and from unnecessarily protracting pretrial proceedings. Furthermore, the government has an interest in protecting Cybergenetics' trade secrets for the same reasons that it has an interest in preventing harassment of a lay witness—to ensure that Cybergenetics remains willing and able to cooperate in prosecutions. *Cf.* H.R. Rep. No. 104-788, at 13 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4021, 4032 (discussing 18 U.S.C. § 1835, which authorizes courts to preserve the confidentiality of alleged trade secrets in economic espionage prosecutions, because "[w]ithout

such a provision, owners may be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets to public view, thus further devaluing or even destroying their worth.").[6]

Some courts have also considered whether the subpoenaed party joins the government's motion to quash or otherwise indicates its unwillingness to provide the requested materials. See *Vasquez*, 258 F.R.D. at 71; *United States v. Chen De Yian*, No. 94 CR. 719 (DLC), 1995 WL 614563, at *2 (S.D.N.Y. Oct. 19, 1995) (finding government had standing in part because subpoenaed party forwarded all material responsive to the subpoena to the U.S. Attorney's Office); *United States v. Elife*, 43 F.R.D. 23, 25 (S.D.N.Y. 1967) ("The letter of Railway Express to this Court (January 19, 1967) expressing its disinclination to make its records available, accords the government standing to object on its behalf."). Here, Cybergenetics has made clear its position that disclosure of the source code is not necessary or appropriate, and will join the government's motion if the Court determines that to be necessary.

But the question of standing is much ado about nothing. Regardless, this Court has an "independent obligation[] . . . to ensure that Rule 17(c) does not become a means of conducting general discovery, which is not permitted in criminal cases." *United States v. Wittig*, 250 F.R.D. 548, 551 (D. Kan. 2008).[7] The Supreme Court has emphasized that "the burden is on the court to

---

[6] A finding that the government has standing to object to subpoenas in criminal matters seeking third-party trade secrets is also consistent with 18 U.S.C. § 1835(a), which provides that the United States may take an interlocutory appeal of any decision or order of a district court "authorizing or directing the disclosure of any trade secret."

[7] The defendant cites a number of out-of-circuit cases in support of his position that the government lacks standing to move to quash the subpoena. *See* Response to Mot. to Quash at *9-10 n.6. Most simply state the general rule that a movant must have some legitimate interest to have standing to challenge a subpoena on a third-party, but do not actually hold that the government lacks standing to challenge an overbroad Rule 17(c) subpoena. *See, e.g.*, *United States v. Beckford*, 964 F. Supp. 1010, 1023, 1031 & n.29 (E.D. Va. 1997) (assuming without deciding that the government had standing, and reviewing the subpoena on the merits). And even in those cases actually holding that the government failed to point to a legitimate interest conferring standing, the court nonetheless reviewed the contested subpoenas on the merits, whether to fulfill its independent

see that the subpoena is good in its entirety and it is not upon the [subpoenaed party] to cull the good from the bad." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951).  This "independent duty to review the propriety of the subpoena … requires the Court to consider whether the documents sought are privileged and whether the subpoena itself comports with the requirements of Rule 17." *Vasquez*, 258 F.R.D. at 71–72.  Additionally, the Court also must ensure compliance with 18 U.S.C. § 1835(b), which gives trade-secret owners the right to be heard before a court authorizes or directs the disclosure of any information asserted to be a trade secret.

### b.  Defendant's response is notable for what it fails to address.

As set forth in its motion, the government outlined ten reasons to quash the subpoena.  The defendant attempted to address some of these bases through the proposed modifications to the subpoena that are discussed above.  Notably, however, the defendant failed to even address some of the bases for quashing the subpoena.

For example, the government argued that the subpoena violated Rule 17 because it required Cybergenetics "provide" the documents.   Rule 17, however, only requires that the entity responding to the subpoena, "have the papers with him at the designated time and place so that they may be used in evidence, but he is not required to surrender possession of them, unless they have been subpoenaed by a grand jury." § 275 Production of Documentary Evidence and Objects—Trial Subpoenas, Wright and Miller, 2 Fed. Prac. & Proc. Crim. § 275 (4th ed.).  This principle demonstrates the fallacy of using Rule 17 to obtain the software verification materials sought by the defendant, a point the defendant tacitly admits by failing to even address this failure in their argument.  The information is only useful to the defense if they have access to it for weeks

---

obligation to ensure compliance with Rule 17(c), *see United States v. Nachamie*, 91 F. Supp. 2d 552, 561 (S.D.N.Y. 2000); *United States v. Ocasio*, No. EP-11-CR-2728-KC, 2013 WL 12442496, at *4 (W.D. Tex. May 28, 2013), or because the recipients themselves filed motions to quash, *see United States v. Tomison*, 969 F. Supp. 587, 597 (E.D. Cal. 1997).

at a time, but Rule 17 does not contemplate that type of access.  Moreover, it is only useful to the defense if it is produced in an electronic format, but producing it in an electronic format allows for it to be easily copied and transferred to competitors.  Thus, production in electronic format would undermine the Trademark principles.  Rule 17 contemplates the production of evidence for trial; not for production for a review by an expert, which is why Rule 17 is not the proper vehicle for production of this material.

The defendant also failed to address who is going to pay for all of this work Cybergenetics will be doing to produce the requested material.  Rule 17 seems to contemplate a $40 witness fee, but it certainly does not contemplate the princely sum it will presumably take to search for, identify, and produce the requested material.  As the defendant is fond of pointing out, Cybergenetics is a for-profit entity.  They are experts who are paid for their services, and notably absent from the defendant's response is any indication of who is to bear the costs of this completely unnecessary fishing expedition.

The most notable absence from the defendant's pleading is a single case in the history of the use of the TrueAllele software in criminal cases where a Court required Cybergenetics to produce the requested materials or where a Court found the TrueAllele software unreliable.  The reason that the defendant cannot cite a case is that producing the source code and other requested materials is unnecessary and the software is reliable.  In contrast, the government has provided this Court with case after case in which court found TrueAllele to be reliable and denied motions to compel production of the source code.  The weight of the authority clearly supports granting the government's Motion to Quash.

The reason that courts are unanimous in this view is that the question is not what is included in the software.  The question is whether the software works, and that is what validation study after

validation study has determined – that it works.  That is why it is used by defense attorneys, innocence projects, and by prosecutors.  It helps find the truth, which is exactly what this defendant does not want revealed.

## VI.     MOTION TO COMPEL DISCOVERY

As the government has repeatedly stated to defense counsel, the government has an "open file" policy related to discovery in this matter.  Counsel for the government has repeatedly made its file available for review and has been more than willing to make the physical discovery available for review upon an appointment with the law enforcement officials who are retaining the evidence relevant to this case – as opposed to the homicide case.  Rather than reviewing the files or making an appointment, the defendant filed a motion to compel.

The Court should deny the motion because the requested information is available for review, will be produced, or is not discoverable.  Of particular note, it is clear from the defendant's requests and from earlier requests contained in subpoenas that the defendant seeks discovery related to the ongoing homicide investigation.  That material, however, is not discoverable in this case and the Court should not require discovery related to an ongoing investigation.

The defendant made a number of specific discovery requests, each of which are addressed below:[8]

- Jail Calls – will be provided;

- Sweatshirt – not available;

- The Defendant's Fingerprints – the defendant's fingerprints are on file in electronic format, and the government will be providing a copy of what the PBP is able to download;

---

[8] The representations set forth below are based on counsel for the government's discussions with one of the PBP detectives in the matter.  Another detective was on vacation when counsel for the government was gathering information related to the availability of these material.  Once that detective returns, counsel for the government will update this information, if needed.

- Fingerprints from Inside Car – these are available by making an appointment with the laboratory;

- Kia Sorento – this vehicle was not retained and it is not available for inspection. Pictures of the vehicle have been provided;

- License Plate Reader Photographs – those photographs relate to the ongoing homicide investigation and are not discoverable in this case;

- Surveillance Footage - those photographs relate to the ongoing homicide investigation and are not discoverable in this case;

- Photographs of Vehicle Involved in Shooting - those photographs relate to the ongoing homicide investigation and are not discoverable in this case;

- Dispatch Audio Call – will be provided;

- Records Related to Drug Dog – this material is no discoverable under any legal theory and has not been provided;

- Prior Police Reports – these reports, if they exist, are only discoverable as Jencks Act material, which the government is not required to produce until after the witness testifies; and

- Video Recordings Recovered from the Knoedler Parking Lot – not available.

The defendant next seeks what he claims are "expert disclosures." These requested disclosures relate to the DNA testing done by the Allegheny County Medical Examiner (ACME). As the defendant concedes, the government already provided the report related to this examination. As discussed in detail above, because the government provided the results of that testing, the government has met its discovery obligations.

In his next request, the defendant seeks the identifiers of three police officers – C3262, C3323, and C3329 – identified on the computer aided dispatch report ("CAD Report") that the government produced. Upon consultation with the PBP, the officer associated with C3262 is Santino Mammarelli. The two other officers are Zone Three officers that are not yet identified. When counsel for the government obtains that information, he will pass it along to defense counsel.

Finally, the defendant seeks identification of the other people contributing to the DNA mixture that included the defendant's DNA and the identification of other known suspects.  Upon consultation with the PBP, counsel for the government is unaware of any responsive discovery.  According to Cybergenetics' analysis, there were likely other individuals' DNA on the firearm, but, without a sample for comparison, it cannot identity anyone else's DNA other than the defendant's.  Cybergenetics, however, will make that comparison, at no additional costs, if the defense provides another DNA sample for comparison.

WHEREFORE, for the reasons set forth above, the Court should deny the defendant's pretrial motions.

SCOTT W. BRADY
United States Attorney

s/ Brendan T. Conway
BRENDAN T. CONWAY
Assistant U.S. Attorney
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
PA ID No. 78726