1

V I R G I N I A

     IN THE CIRCUIT COURT OF FAIRFAX COUNTY

- - - - - - - - - - -x
                  :
COMMONWEALTH OF VIRGINIA   :
                  :
  -vs-             :  CRIMINAL DOCKET NO.
                  :  FE-2019-0000279
CLARK DEVELL WATSON,     :
                  :
       Defendant.   :
                  :
- - - - - - - - - - -x

                  Circuit Courtroom 4H
                  Fairfax County Courthouse
                  Fairfax, Virginia

                  Friday, October 23, 2020

     The above-entitled matter came on to be heard before THE HONORABLE DONTAÉ L. BUGG, JUDGE, in and for the Circuit Court of Fairfax County, in the Courthouse, Fairfax, Virginia, beginning at 9:07 o'clock a.m.

     APPEARANCES:

          On Behalf of the Commonwealth:

               LAUREN E. HAHN, ESQUIRE
               Assistant Commonwealth's Attorney

               TYLER BEZILLA, ESQUIRE
               Assistant Commonwealth's Attorney

          On Behalf of the Defendant:

               BRYAN KENNEDY, ESQUIRE
               Senior Assistant Public Defender

          On Behalf of Cybergenetics:

               BRANDON R. SHAPIRO, ESQUIRE

EXHIBIT 4

2

```
1              P R O C E E D I N G S

2              (The Court Reporter was sworn by the Clerk of

3   the Court.)

4              MR. KENNEDY:  Good morning, Your Honor.  Bryan

5   Kennedy from the Office of the Public Defender on behalf

6   of Mr. Watson.

7              THE COURT:  Good morning, Mr. Kennedy.

8              Calling the matter of Commonwealth of Virginia

9   versus Clark Watson, FE-2019-279.  Mr. Watson is present

10  in court --

11             Good morning, sir.

12             THE DEFENDANT:  Good morning, Judge Bugg.

13             THE COURT:  -- in the custody of the Sheriff's

14  Department with his counsel, Mr. Kennedy.  On behalf of

15  the Commonwealth, Ms. Hahn and Mr. Bezilla are present as

16  well as counsel for Cybergenetics, Mr. Shapiro.

17             MR. SHAPIRO:  Good morning.

18             THE COURT:  This matter is on the Court's

19  docket this morning for a review from our hearing last

20  week or the week before last as well as Mr. Watson's

21  motion for bond.

22             Mr. Kennedy, I'll hear from you first in terms

23  of status of the compel order.
```

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

3

1          MR. KENNEDY:  Your Honor, the bond motion,

2     I'll say, is related to the status and the compel order.

3     That's why I noticed the Court for that today.

4          THE COURT:  And I think at first it was going

5     to be with Judge Oblon, but once reviewing the bond motion

6     we will go ahead and take it up now.

7          MR. KENNEDY:  Thank you.  So after the Court's

8     ruling last week, I spoke to my expert.  And by way of a

9     little bit of background, I've been working with him for

10    over a year on this case.  It's also a unique case because

11    it's not just a DNA issue, it's a computer science issue

12    and a statistics issue.  So the reason I have this

13    particular expert is because in the same shop it's a PhD

14    biologist, who's a DNA expert; a computer science expert;

15    and a PhD statistician who all work together, and it's

16    only one payment for the group.  So it basically is I

17    think better for the Commonwealth, better for us, and

18    obviously we have all of the expertise in the same group

19    who work together.

20          So speaking to my expert, I asked him about

21    traveling and cost, and that's when he raised with me that

22    during the pandemic he has not been doing work-related

23    travel because his partner with whom he lives is medically

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

4

1   vulnerable to COVID to the point where she has a -- her

2   work is back, but she has a medical clearance to not go to

3   work and is working at home full-time.  And my

4   understanding from him is she basically doesn't leave the

5   house.  He leaves the house to go to his office where he

6   works alone and then he does all of the other life things

7   that people would need to do.

8           Also, my expert is basically doing the same

9   thing for his two elderly parents, who are vulnerable to

10  COVID, who also live in the same city.  He is basically

11  the only person taking care of all of those people.  So

12  because of that he is not comfortable traveling anywhere

13  or staying in public accommodations, going to someone

14  else's office.  And I think that's perfectly reasonable

15  given his family's situation at the moment.  So basically

16  right now it's not going to be possible for him to go to

17  Mr. Shapiro's office to view the source code.

18          So I was following up with him to try to talk

19  through some strategies that we might be able to get

20  around that issue.  The first one, and because we've still

21  -- we don't have an order to the Court from the last

22  hearing yet because Cybergenetics had some thoughts on the

23  order I drafted, so we've been still going back and forth

EXHIBIT 4

5

1    to actually try to work that out before we had to involve

2    the Court, and I think we're going to be able to work that

3    out.

4            But we didn't have a protective order so I

5    wasn't able to go see the computer yet.  But obviously

6    there is the ability for someone like I've had my IT

7    people do to my computer, remote into a computer.  They

8    can access the computer; they can look at it and then

9    basically go out of it.  So the actual computer can stay

10    in Mr. Shapiro's office.  But I don't know what

11    Cybergenetics' position is on that.  If I had to guess, I

12    think I know Cybergenetics' position would be on that, but

13    that's the best workaround we found.

14            The other workaround is obviously the one that

15    I suggested the last time, which is that the secured

16    laptop or tablet, whatever it is, be sent to my expert in

17    Ohio.  He would obviously still be subject to the

18    protective order, subject to the contempt power of this

19    Court.  He has no interest in going beyond that because

20    his job is being an expert for courts.  He's a forensic

21    computer scientist along with other forensic analysis in

22    his practice.  So he has no interest in violating that but

23    that would be a way to keep it all together, go there, and

EXHIBIT 4

6

1  come back.  Those are two workarounds.

2          Obviously, right now, we're trying to find

3  workarounds for court, work jury trials, for everything at

4  the moment, and those were the two things we could come up

5  with that would protect his family and try to protect

6  Cybergenetics and try to work around those goals as well.

7          So the third option there is that we have to

8  continue the case until a time when we could make this

9  happen.  If Cybergenetics won't let this material

10  information that we all agreed at this point is material

11  and subject to a valid subpoena, if we can't do it now, we

12  can't go to trial.  Cox against Commonwealth, I cited it

13  in my motion, says it's error to go forward without the

14  Defense having access to material information.

15          At Term Day yesterday, I had a trial set for

16  December 6th of 2021.  That was the next trial, so we're

17  talking about over a year before.  And, god-willing, we

18  will be moving trials up if something good happens in

19  terms of a vaccine and safety, but as of right now the

20  next available trial dates are at best 13, 14 months away.

21  And that's where my bail motion comes in because if that's

22  the only solution we can reach, that Cybergenetics won't

23  let us use these remote options, if we have to continue it

EXHIBIT 4

7

```
 1    out that far in the hopes that just losing this trial date
 2    we're going to have to continue out that far anyway, but
 3    then hopefully in the next year, we'll be able to work
 4    this out, things will get better, and my expert will be
 5    able to come out here, whatever it is.  If we're doing
 6    that then I need to ask for bail.
 7              So I won't make my bail argument at this time,
 8    but that's the status of the case right now depending on
 9    where we go.  And obviously, I would like to make a bail
10    argument if we need to get there.
11              THE COURT:  Okay.  Mr. Kennedy, do you have
12    any indication from your expert if his status at home with
13    COVID and not traveling is going to impact his ability for
14    the current trial date?
15              MR. KENNEDY:  So the current trial date, if
16    that was kept and we were going forward to trial, I would
17    be asking that he appear remotely.
18              THE COURT:  Okay.
19              MS. HAHN:  And Your Honor, we'd either be
20    objecting or probably asking that some of our witnesses
21    appear remotely, such as any elderly witnesses we have,
22    maybe the federal prisoner in Kentucky, who a writ --
23              THE COURT:  Do you have elderly witnesses?
```

EXHIBIT 4

8

1          MS. HAHN:  Your Honor, I think that the

2   victim, at this point, is probably over 50 based on just

3   my review of the video.

4          THE COURT:  That's elderly?

5          MS. HAHN:  Sorry.

6          (Laughter.)

7          MS. HAHN:  Maybe over 60, but I don't know his

8   health situation.  I haven't --

9          THE COURT:  I think you're going to offend

10   some people in this room.

11          (Laughter.)

12          MS. HAHN: I haven't inquired, Your Honor, but

13   I think it would be, from what I've seen with some of

14   these virtual hearings, extremely difficult to have an

15   expert remotely.  Judge Gardiner and I had a three-hour

16   competency hearing with experts down in Western State.  It

17   was a disaster.  You couldn't hear people half the time.

18   It was really hard to cross or direct them.  So we'd

19   really have to discuss that, if that what is being

20   suggested by counsel.

21          MR. KENNEDY:  Your Honor, I will just point

22   out that the Commonwealth does not have a confrontation

23   right, so it's a completely different analysis about

EXHIBIT 4

9

1   people appearing by video between Defense expert and a

2   government expert.  Although, I will say, I agree that the

3   best practice would not to be to have that happen, to

4   someone appear by video.  I would be doing it because Mr.

5   Watson is incarcerated, has speedy trial rights, has jury

6   trial rights; the government doesn't have a confrontation

7   right; and to get that case tried that day that's how we

8   would do it.  And obviously that would only be if the DNA

9   came in and the Court denied my pending motion.  So

10  there's a lot of moving parts there, but that's we're we

11  are.

12              THE COURT:  All right.  Ms. Hahn or Mr.

13  Bezilla?

14              MS. HAHN:  Your Honor, I think most of my

15  comments would refer to the bond motion, so I can hold off

16  on those until we argue that.  So I don't know if the

17  Court wants me to address something in particular or if

18  the Court wants Mr. Shapiro to address it because it seems

19  like the question right now is a reconsideration of the

20  Court's ruling from last week about how the source code is

21  going to be provided to the Defense expert.

22              So we join in Mr. Shapiro's position.  We

23  think that Cybergenetics has been eminently reasonable at

EXHIBIT 4

10

1   this point in saying we're going to make this available,

2   you can even take photographs of it, you just have to do

3   it in a protected situation.  And frankly, the

4   Commonwealth thinks this has really gotten pretty out of

5   hand.

6               So I'll let Mr. Shapiro address the Court as

7   to that reconsideration and then I'm happy to address the

8   Court about bond.

9               THE COURT:  All right.  Thank you.

10              Mr. Shapiro?

11              MR. SHAPIRO:  Your Honor, if it may please the

12   Court?  First, thank you to Ms. Hahn.  I will tell the

13   Court, we never received a copy of the motion until about

14   5:00 p.m. from Ms. Hahn last night.

15              And of course, needless to say, it's actually

16   directing Cybergenetics as part of our motion to amend or

17   reconsider, we would be 100 percent opposed to sending it

18   Ohio with the same concerns.  As the Court is well aware,

19   remote access or sending it there doesn't provide any

20   safety.  And the reason for it is one of the protective

21   orders I -- Mr. Kennedy has sent me a protective order and

22   I kind of redrafted it just to limit it to be sweet and

23   simple to exactly what the court order and what

EXHIBIT 4

11

1    Cybergenetics asked for in this case.

2              But one of the concerns, and we put it in the

3    protective order, is not to be able to record or copy in

4    any format.  Well, if they're remotely accessing -- and I

5    will tell the Court, it's on a iPad.  I don't think they

6    can even remotely access that, but it still doesn't

7    protect us.  We don't know on the other side what they're

8    doing.  They could be sitting there with a video camera

9    basically right at it recording every little thing, even

10   though they're not printing it.

11             If we send it to Ohio, same predicament.  And

12   I know we talked about like ransomware situation with the

13   county schools.  They could easily sit there with their

14   video camera and record that too right off of it, just

15   slid from page to page to page and then they have the

16   whole code, whichever they can do with it.  They can

17   market it themselves, if they want to.

18             Everyone hopes that everyone would be honest,

19   but as the Court knows, it's a business, and if someone

20   gets their hands on it, they could use it to their benefit

21   down the road, and there might not be any way to prevent

22   that.

23             But what I would submit at this time is that I

EXHIBIT 4

12

1   understand it's a pandemic, but the nature of an expert,

2   especially if you're coming from Ohio for business in

3   Virginia, is that there's going to traveling.  And what I

4   would submit to the Court is that one option is that we

5   provide funding for someone like me to go up with it, the

6   iPad, and I can meet him at a neutral source and they can

7   sit in there and review it, so I can monitor to make sure

8   -- not that I want to spend my ten-hour days sitting in a

9   room with them.

10          The other option is that, I hate to say it, I

11   understand he has elderly parents and takes care of them

12   and works with these other individuals, but he can also

13   come here and then quarantine himself for 14 days as the

14   CDC has always required, you know, when you've traveled

15   somewhere to quarantine for the 14 days to protect.  But I

16   don't think that is enough at this point to violate, what

17   I would say, provide this whole source code with any sort

18   of restrictions whatsoever.

19          I think what the Court ordered last time, and

20   I think what Cybergenetics offered in the sense of what is

21   their business is extremely reasonable under these

22   circumstances.

23          And unfortunately, it's their expert.  I

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

13

1    understand why they're retaining this individual, but

2    that's the nature of the business.  If you're an expert

3    from Ohio and you're seeking out business in Virginia or

4    throughout the United States it is known you're going to

5    be traveling.  You can't think that every time a case

6    comes up that they're going to send you directly all the

7    evidence in this case.  And I submit to the Court that

8    that is not good cause to amend it and I would ask the

9    Court to deny that part of it.

10          And I will tell the Court just briefly --

11          THE COURT:  Hold on a second.

12          Am I missing a secondary motion?

13          MR. SHAPIRO:  Well, deny their

14    reconsideration.

15          THE COURT:  There's a reconsideration that was

16    filed?

17          MR. SHAPIRO:  So in their actual order they --

18          MS. HAHN:  I think it's Section 6 --

19          MR. SHAPIRO:  Right.

20          MS. HAHN:  -- I guess, of the motion.

21          MR. KENNEDY:  Your Honor, I filed a bail

22    motion, which is why I did not send it to Cybergenetics

23    because I don't need to inform private companies if I'm

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

14

1    going to ask for bail in a case.  As part of my bail

2    motion, I just was laying out what I just laid out to the

3    Court --

4                THE COURT:  I gotcha.

5                MR. KENNEDY:  -- so that the Court would know

6    basically the purpose of this is as one of the potential

7    solutions to the problem, it would require me asking for

8    bail.

9                THE COURT:  I understand.  I just wanted to

10   make sure I didn't miss an entire motion.

11               MR. SHAPIRO:  And I will tell the Court, my

12   reading of it, as Ms. Hahn sent it to me last night, was

13   that it was we're asking for conditions of bail, but we're

14   also asking the Court to reconsider because it does

15   mention in there that it's going to address that with the

16   Court.  And that's why I refer to it as a motion to deny

17   the motion, but I would ask the Court not to order such

18   and still impose the protective order that we entered last

19   time at the last hearing.  And I would tell the Court, I

20   do have -- Mr. Kennedy and I are still working on that.

21               And one thing just for clarification, we were

22   doing -- Mr. Kennedy sent the draft order to me.  The

23   protective order, I don't think we're going to have issue

EXHIBIT 4

15

1    with going through with the drafted one, it's the main

2    order that says what the Court's actual rulings were.  And

3    one of the things Cybergenetics took -- and I honestly

4    don't remember, and I didn't order the transcript -- was

5    that whether the Court -- there were two things really in

6    there: one is that Cybergenetics had not complied with the

7    Court's order, was not in compliance; and number two was

8    that they had been validly served with process.

9              What I would submit to the Court is I believe

10   is I don't think we ruled they hadn't complied, what we

11   did is we denied the motion to quash; we 100 percent said

12   that Cybergenetics had availed themselves of the Court's

13   jurisdiction.  I don't think we ever ruled that they were

14   validly served with process.

15             The problem was, as the Court noted, and I

16   apologize, was that in my motion I said they had never

17   filed anything with the Circuit Court and it turned out

18   they had be First Class Certified Mail, I guess.  And

19   then, of course we didn't file our motion simultaneously.

20   And the Court said we had availed ourselves.  I don't

21   think ever actually addressed to say whether it was a

22   proper service of process.  The fact remains that they

23   responded; we responded.  That does avail us of the

EXHIBIT 4

16

1    jurisdiction of the Court as the Court said.  And I don't

2    think we ever ruled they weren't in compliance, but I

3    think we kind of just said okay, we're going to order the

4    reconsideration, amend the protective order to have them

5    the ability to come to our office and review it.  And

6    that's the only thing I'd ask for clar -- that's the only

7    question that I had with Mr. Kennedy in our order on that

8    matter.

9              THE COURT:  All right.

10             MR. SHAPIRO:  Thank you.

11             Mr. Kennedy?

12             MR. KENNEDY:  Your Honor, in terms of the

13   Commonwealth's position that this as getting out of hand,

14   it's not getting out of hand because of Mr. Watson.  Mr.

15   Watson is trying to get access to material information

16   that the Court has ruled is material to defend himself

17   against a life offense that the Commonwealth has brought

18   by choosing to use certain evidence, which it does not

19   need to use if doesn't want to, but I guess it can use,

20   against a company that's been trying to keep its

21   conviction box secret for years.  That's where we are.

22             This is a difficult case.  It's difficult

23   litigation.  I get that.  And we're moving along, quite

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

17

1    frankly, a lot closer than I thought we were going to at

2    the beginning.

3              When I retained this expert, he was 100

4    percent and has for years flown all over the country.  And

5    when we initially got the Cybergenetics NDA that required

6    him going to Pittsburgh, he said, "If push comes to shove,

7    I can go to Pittsburgh."  We had that whole conversation:

8    how much would it cost, how long, how many days.  The

9    intervening issue between that conversation and today is a

10   worldwide pandemic that is killing thousands of Americans

11   every day, and it's killing people like my expert's

12   partner and parents.

13             And I know Mr. Shapiro says part of the deal

14   is you have to travel.  That's true, but part of the deal

15   is not I have to risk my family's life to go to Virginia.

16   Because, quite frankly, what's going to happen is if

17   that's the only thing that can happen, he's not going to

18   come because he doesn't have to, because the contract, he

19   can end the contract and say I'm not going to endanger my

20   family's life.  And then where am I?  I have a right to

21   effective assistance of counsel, and Mr. Watson has a

22   right to expert assistance.  I need the expert assistance.

23   We've already found a particularized need.  I have to get

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

18

1    a new expert.

2              And I actually spoke to my expert and spoke to

3    a few other people about whether there's someone in

4    Virginia or Maryland who does this.  And the answer is no.

5    There's only a few experts around the country that are

6    dealing with the computer science of source code for

7    probabilistic genotyping, and you need that specialized

8    knowledge.  And again, having everyone together -- because

9    otherwise I have to find a DNA expert who knows about

10   probabilistic genotyping.  There are a few of those people

11   obviously around.  Then I have to find a computer

12   scientist, get those two together to catch the computer

13   science up to science because you can't really review the

14   source code to know if it is running the math correctly

15   unless you know what the math is.  So that's where it's

16   all difficult.

17              So that's where -- if the proprietary

18   information is their right to protect that and the Court

19   is crafting an order to protect that, the only way to get

20   around that, and I suggested these other alternatives

21   because I think as an officer of the Court that's what I

22   need to do.  I came to the Court.  The Court instructed me

23   go figure out how we can make this happen under my order.

EXHIBIT 4

19

1   I tried to do that.  I hope what the Court sees is I

2   looked at can I get a new expert; can I do this; can I do

3   that; can I do that.

4           I wanted to exhaust all of that because quite

5   frankly, what we really want is to go to trial on November

6   30th with an expert, if the Commonwealth is going to

7   insist on using this evidence and the Court denies my

8   motion, and have the trial then.  That's what Mr. Watson

9   has wanted for a while.  But if we can't do that, the only

10  option, no matter what the Court wants to do with my

11  expert, is we can't have the trial on November 30th

12  because if I can't get someone into that office to see

13  that information, the only option is a continuance and

14  then we're talking about 2022.  And that's, again, where

15  my bail argument would need to be taken up.

16          I think that's all I have to say on the status

17  issue.

18          THE COURT:  All right.  One moment, the Court

19  is going to take a brief recess.

20          (Recess.)

21          THE COURT:  Back on the record in the matter

22  of Commonwealth versus Watson.  I have an understanding of

23  the status, and before making a decision on that, let's

EXHIBIT 4

20

1    take up the bond motion because I think they're so

2    interrelated I can make one ruling at the same time.

3              So Mr. Kennedy, I'll hear from you on Mr.

4    Watson's motion for bond.

5              MR. KENNEDY:  Your Honor, quite frankly,

6    independent of these issues, Mr. Watson is a good

7    candidate for bail, but certainly with these issues, Mr.

8    Watson is a good candidate for bail.  The charge before

9    the Court is a robbery and use of a firearm from 2014.

10   That's the date of offense.  It wasn't actually charged

11   until I think 2018.

12             The actual facts of the case are a pretty run-

13   of-the-mill robbery with a gun at the 7-Eleven.  Two men

14   with faces covered come into the 7-Eleven, tell the clerk

15   to get down.  One of them has a firearm.  They go behind

16   the counter; they pull out the phone cord; they take money

17   out of the register, and they leave.

18             That case went unsolved, as I mentioned, for

19   about four years.  About four years later, the Federal

20   Bureau of Investigation and the United States Attorney for

21   the Eastern District of Virginia went to a federal prison

22   that at that time was out in either New Mexico or Arizona

23   to talk to a cooperating witness.  That witness had been

EXHIBIT 4

21

1    sentenced on -- I think he got sentenced on eight Hobbs

2    Act robberies, but his proffer included about 20 or 30

3    Hobbs Act robberies, including a robbery of this same 7-

4    Eleven on a different date.  That witness was shown a

5    picture, a grainy still from the video in this case.  He

6    said, "Who are those people?"  And he said, "Oh, that's

7    Clark."  So that's how the Feds became involved in the

8    case.

9              They eventually passed the case off to the

10   Commonwealth Attorney's Office where they then went

11   through DNA testing; they did the standard PCR testing.

12   That came back inconclusive.  It was a complex mixture

13   with too little information.  They then did -- I think

14   they did Y-STR as well and then they did TrueAllele.  And

15   that's how we ended up here.

16             The actual person who was the clerk of the

17   store at preliminary hearing could not identify Mr. Watson

18   as a person who did the robbery.

19             So at the time Mr. Watson was served with

20   these warrants, he was serving a federal sentence for

21   unlawful possession of a firearm out of the District of

22   Columbia.  That sentence has been over now for many

23   months.  I think it ended in March.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

22

1        He, if released, is on three years' supervised

2    release with the Superior Court in the District of

3    Columbia, so he will be supervised in the District of

4    Columbia there.  He would live at ███████████████

5    ████  in D.C.  That's with his aunt, Crystal Pimble.  I

6    verified that with her that he would go right there and

7    live with her.

8        Obviously, Mr. Watson's incarceration has

9    already had a pretty big impact on his life.  His wife

10   died since he's been incarcerated on this case in this

11   jail.  At the time we couldn't do a furlough because he

12   was still held on the federal sentence.

13       He has children with his wife.  They were

14   subject to a hearing in D.C. Superior on their

15   guardianship.  I was in touch with D.C. Superior Court on

16   Mr. Watson's behalf where he expressed his desire to

17   obviously stay in his children's lives, get custody, care

18   for his children, but because of his incarceration the

19   Court there entered a temporary custody order for one of

20   his family members to take care of the kids.  But

21   obviously, he has links to the area, is anxious to get

22   back and help his family as much as he can.

23       His record includes a couple distributions.  I

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

23

1   don't have the dates there with me but those were with

2   from some time ago.  There is a robbery on his record.

3   That's from 1994, and I think that's his only other

4   violent offense, but that's from obviously almost 20 years

5   ago.

6               So he is not a risk of flight; he's not a risk

7   of danger; he's going to be on probation.  The Court can

8   also put him on SRP.  He has a verified address.  He will

9   obviously look for employment and get assistance there

10  with probation.  And especially given the other issues

11  we've raised today, I would submit he's a good candidate

12  for bail.

13              THE COURT:  All right.  Thank you.

14              Ms. Hahn?

15              MS. HAHN:  Thank you, Your Honor.  Your Honor,

16  as the Court can aspect, we're strongly opposed to bond in

17  this case as we have been in previous bond motions.  And

18  there was a bond motion before Judge Bellows, I think,

19  over COVID.  I want to say it was in March or April, and

20  that was denied.

21              So I want to remind the Court of some of the

22  dates in this case.  I know this Court has presided over a

23  number of motions over the past probably year and a half

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

24

1   at this point, and this is really a tortured history.

2          Some of Mr. Kennedy's facts and dates about

3   the inception of this case are a little bit inaccurate.

4   This Defendant was ID'ed by Corey Rodgers in federal

5   custody after I was involved in the matter.  So I was

6   originally approached by Detective McAuliffe (ph), who had

7   been in contact with Becky Bellows in EDVA, told that they

8   believed that we had a robbery we might want to pursue

9   with this Defendant as one of the suspects in that

10  robbery.  And it was after that fact before I charged it

11  that I wanted to make sure that this was a good ID and I

12  sent an FBI agent out to that federal facility to speak

13  with Mr. Rodgers.

14          So regarding the facts of the case, I don't

15  know that I agree with a run-of-the-mill description.  It

16  is certainly a run-of-the-mill violent commercial armed

17  robbery.  It is this Defendant that had the firearm.  That

18  is clear from the identification from Mr. Rodgers.  This

19  Defendant pushes the victim down to the ground behind the

20  counter; there's a gun at head-level at some point during

21  this.  It's very violent, very scary of course for the

22  victim, and a frightening incident for the community.  So

23  this is not just a couple guys go in, ask for some money,

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

25

1    and leave.  There was physical contact and gun-to-the-head

2    type of behavior that occurred.

3            So I just want to remind the Court and Mr.

4    Kennedy that the Commonwealth filed a DNA notice in this

5    case June 6 of 2019.  He was brought over and a prelim was

6    held March of 2019.  Then in July of 2019, we were before

7    this Court with Mr. Kennedy requesting a continuance for

8    all of this DNA evidence.  And this Court I think had a

9    very hard time with that continuance motion and considered

10    denying it because Mr. Rodgers was over here in our ADC in

11    isolation.

12            And Mr. Rodgers is in Kentucky at this point I

13    believe, although, there have been some transfers that

14    have been discussed.  So I'm not exactly sure where that

15    puts him, but a writ has been issued for him to be brought

16    over within the next couple weeks, if he hasn't been

17    brought over already.

18            So this is probably the fourth writ that I've

19    issued for him in this case.  And when I say this is

20    getting out-of-hand, it really is.  The number of

21    subpoenas that have been issued in this case, the number

22    of continuances are really beyond the pale.

23            So we are back in June or July, I'm objecting

EXHIBIT 4

26

1    to a continuance.  This Court because of various issues

2    decided to continue it, and I sent Mr. Rodgers back to

3    federal custody.  And that was over a year ago, and here

4    we are back again with Mr. Kennedy still not having made

5    really any progress whatsoever on this DNA motion that he

6    wants to pursue.  And it was back in September of 2019

7    that Cybergenetics responded to the subpoena duces tecum.

8    So that was over a year ago that Mr. Kennedy has had all

9    of this time to start this litigation that is before the

10   Court right now.  We are a year past that.

11           I would submit to the Court at this point if

12   the issue is with Mr. Kennedy's expert, then he needs to

13   get another expert or he needs to find some way to make

14   this work because we have a November 30th trial date that

15   his office fought for at Term Day.  I got up before Judge

16   White and said, "I don't believe there's anyway this going

17   to be ready for trial considering the DNA situation."

18           And there people and incarcerated defendants

19   who were not given that trial date because Mr. Kennedy and

20   his office wanted it.  They wanted the November 9th trial

21   date.  They wanted the first trial date before this Court,

22   and I made it clear to Judge White that that was a bad

23   idea and we didn't set that.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

27

1        So now he wants to continue a case off of a

2   date that is highly valued to this Court and other

3   defendants, probably too late for another case to be set

4   then.  And I would submit to the Court that that's -- it

5   is very unfair to the Commonwealth, to other defendants,

6   and to this Court.

7        I think throughout this case Mr. Kennedy has

8   been holding the Court and the Commonwealth hostage with

9   this DNA litigation.  And now he's saying hey,

10  Commonwealth, don't use your evidence or my client gets

11  out on bail on a presumption case with a prior robbery on

12  his record for a gun-to-the-head robbery.  And the

13  Commonwealth thinks that's entirely inappropriate, that

14  this Defendant is not appropriate candidate for bond.

15       His address that he would live at, I'll tell

16  the Court, Ms. Pimble presumably is mother or relative of

17  Quintin Pimble, who was his co-defendant in this robbery

18  and is serving, I want to say 20-plus years in federal

19  prison.  This was a serial ring of robberies that occurred

20  with Mr. Watson, Rodgers, and Pimble.

21       I can't explain to the Court some of the

22  decisions that went into the federal government deciding

23  not to prosecute Mr. Watson, but I'll tell the Court that

EXHIBIT 4

28

1   Mr. Rodgers has described numerous incidents with this

2   Defendant.  He is older than both of those other

3   defendants.  I don't think that earlier robbery on his

4   record is mitigating because it was old, I think it's

5   aggravating because it shows that for decades this

6   Defendant has been committing robberies and continues to

7   do so.

8            The Commonwealth has no belief that this

9   community would be safe if this Defendant was released.

10  He was in federal custody at the time of the serving of

11  these warrants for a firearms offense.  It is clear that

12  this Defendant will continue to commit offenses and that

13  those offenses will be violent, so we would strongly

14  oppose bond.

15           And I would tell the Court, I think that Mr.

16  Shapiro has offered numerous options for Cybergenetics to

17  make it work with this expert.  At this point the

18  Defendant has rights to have an expert, and an expert is

19  choosing to some degree, but it can't be unreasonable.

20  And we have reached an unreasonable place in this case

21  where we have a trial date that is probably the tenth or

22  more trial date that has been set in this case.

23           We have a defendant who's a violent offender,

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

29

1    whose guidelines I believe are between -- Mr. Kennedy can

2    correct me -- maybe 13 to 20 years, I want to say is where

3    the guidelines are.  He's not even close to the low end of

4    the guidelines on the time served so far.

5              We would strongly object to bond and ask the

6    Court to deny his motion and direct his expert to either

7    respond here to Virginia or facilitate this in a way that

8    allows us to go to trial on November 30th.

9              THE COURT:  All right.  Thank you.

10             Mr. Kennedy?

11             MR. KENNEDY:  Your Honor, in a normal case, I

12   issue a subpoena to the Department of Forensic Science,

13   which I did in this case; they send me their file, which

14   they did in this case; and I can send it to an expert in

15   Virginia, which I would have done in this case if that was

16   the situation, and then we go forward on it.  That's how

17   we do 90 percent of the DNA cases, and in this Court

18   that's how we do 99 percent of the DNA cases.  This case

19   is complicated.  It's complicated because the Commonwealth

20   chose to use an emerging software that the company has

21   kept hidden, and we already talked about that.

22             But we have a person who has a verified

23   address.  We have an offense that occurred in 2014 for

EXHIBIT 4

30

1  which Mr. Watson was not incarcerated until 2018.  The

2  Commonwealth talks about he's a part of this string of

3  robberies.  I have a feeling that if they had actual

4  evidence of that they would have charged them either in

5  this Court, some other jurisdiction, or in the federal

6  court.  They have not done any of that.  He has not been

7  charged with any other robberies.

8          Their star witness has been charged with a

9  bunch of robberies and is serving a 30-year sentence in

10  federal court.  That's going to go to the weight of the

11  evidence, among other things, because he's trying to get a

12  Rule 35.

13          But, here, what we're talking about is there's

14  material evidence that the Commonwealth has conceded is

15  material that is not back that we need to have an expert

16  look at because I don't know anything about source code.

17  But has it been a journey?  Yes, but it's a journey

18  because of the complexity of the case.

19          And where we are right now is given the

20  complications of COVID-19, which it always seems that it's

21  the criminal defendant who has to give up rights with

22  COVID-19 issues, it's not the Commonwealth, it's not a

23  private company.  It always seems to come down to my

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

31

1  clients have to be endangered in jail; my clients have to

2  have less than perfect jury trials; my clients have to

3  have all their speedy trial rights taken away.  And this

4  is not one that the Supreme Court has taken away yet, the

5  right to call for evidence in your favor, and it would be

6  error to proceed at this point without us being able to

7  look at this evidence.

8           I wish we could go could forward on November

9  30th.  I would ask the Court to grant my motion to exclude

10  DNA so we could go forward on November 30th, but short of

11  the Court making decisions on that the only option here is

12  to pick another trial date, which won't be for a long

13  time.

14           Mr. Watson is not a flight risk; he's not a

15  danger to the community on any actual facts other than the

16  1994 robbery and this old robbery as well.  And he is

17  going to be supervised by the District of Columbia and by

18  this Court, if the Court puts him on SRP.  Those are the

19  least restrictive alternatives for bail.  I'd ask the

20  Court to admit him on those and whatever other conditions

21  the Court deems fit so that we can get this case tried in

22  a constitutionally acceptable fashion.

23           THE COURT:  Thank you, Mr. Kennedy.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

32

1        All right.  Just a moment.

2        (Pause.)

3        THE COURT:  What the Court is going to do on

4   Mr. Watson's motion for bond, I think the presumption,

5   given all the facts and circumstances, has been rebutted

6   in his case.  What we have is a long, tortured history of

7   this case, if nothing else, before this particular Judge

8   and this Court in general.  It's the unique circumstance

9   that the Commonwealth has made the election to use

10  Cybergenetics to prove their case, and that's well within

11  their right.  The Court has to balance all of the

12  Constitutional rights afforded to Mr. Watson in light of

13  the proprietary interest of Cybergenetics, which I don't

14  know the answer of where that stacks versus a person's

15  Constitutional rights.

16         I understand Cybergenetics feels that they

17  have been very, very cooperative.  Very cooperative would

18  be sending this iPad securely to the expert in Ohio.  A

19  number of other things would have been very cooperative.

20  We haven't gotten to that point, and the Court will have

21  to address that at a different date.

22         But given what we have with the pandemic, the

23  identified expert, who was identified long before pandemic

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

33

1    was involved in this case and those concerns about that

2    expert being able to comply with Cybergenetics' conditions

3    that they, themselves, are placing on their ability to

4    share this information with the Defendant, who has a right

5    to review that and challenge that in court, the Court is

6    going to grant Mr. Watson's motion for bond.

7           I'm going to reset bond in this matter at a

8    $25,000 PR bond with the special conditions, sir, you will

9    be on the Supervised Release Program with call-in status.

10   You will required to reside at the address at ████████████

11   ████████████ --

12           MR. KENNEDY:  Your Honor, apparently, I had a

13   typo.  It's ████.

14           THE COURT:  Thank you.

15          -- ████████████████, and that

16   you're to comply with the terms and conditions of your

17   federal probation.

18           So as to the bond motion that will be the

19   Court's ruling.

20           MS. HAHN:  Your Honor, the Commonwealth is

21   requesting that the Court stay its order so that we can

22   appeal to the Court of Appeals the Court's bond decision.

23   We would submit to the Court that this is the Defendant's

EXHIBIT 4

34

1    motion to continue and that he is causing the delay in

2    this case.

3              This is a violent presumption offense and we

4    do want to take our appeal.  We will do it very quickly so

5    as to make sure that he is held no longer than possible if

6    the Court of Appeals rules in his favor, but we would ask

7    the Court to stay its order considering the nature of the

8    offense and his record and the guidelines in this case.

9              THE COURT:  Ms. Hahn, you said you view it as

10   his motion to continue.  Explain that to me.

11             MS. HAHN:  Your Honor, the Defendant writes in

12   his motion that he will ask for a continuance in this

13   case. The Commonwealth, well, he says, "Continues to

14   insist on using the software."  I would submit to the

15   Court that this is DNA evidence, this is not an unusual

16   situation for the Commonwealth to want to use DNA evidence

17   in a criminal case.  So we --

18             THE COURT:  Ms. Hahn, don't you acknowledge,

19   though, this is different than just calling in the usual

20   experts from DFS?

21             MS. HAHN:  Your Honor, we've been using

22   TrueAllele for several years in this courthouse.

23             THE COURT:  I understand that.  I understand

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

35

1    that.

2            But for several years have you had a defendant

3    that has pursued that I want to challenge the source code,

4    and Cybergenetics has said, "No, you can't get the source

5    code"?  That doesn't happen in every case.

6            MS. HAHN:  We had the Public Defender's Office

7    challenge TrueAllele, I want to say maybe 2014, 2015.  I

8    do not recall if they asked for source code as part of

9    that motion.  It was not my case, so I can't tell the

10   Court that, but maybe Mr. Kennedy could.  I know that

11   there are cases throughout the country and other Virginia

12   jurisdictions in which individuals have sought out source

13   code, and I know Mr. Shapiro could probably talk to that

14   more than I could after speaking with Cybergenetics.

15           But I just remind the Court that it was over a

16   year ago that Mr. Kennedy received Cybergenetics'

17   response.  He has had a year to pursue this.  And he never

18   asked for bond before March because his client was serving

19   a federal sentence for a firearm possession.

20           THE COURT:  So he couldn't ask for bond;

21   right?

22           MS. HAHN:  Well, he could have asked for bond

23   from this Court but he would have still been held

EXHIBIT 4

36

1    federally, correct.

2              THE COURT:  Okay.

3              MS. HAHN:  Your Honor, I think considering the

4    nature of the offense, it would be appropriate for a stay

5    to be entered.  I would also tell the Court that it's been

6    five months since Mr. Kennedy's last bond motion in this

7    case, so I think the urgency to release him immediately

8    today is not there when it's been five months since that

9    bond motion.

10             Additionally, this issue with expert not being

11   able to come down to Virginia because of medical reasons,

12   that was not raised last week, that was not raised before

13   now.  None of us knew about that until now and it

14   conveniently comes at the same time as asking for bond.

15             So I would ask the Court to stay the order and

16   enable the Commonwealth to note an appeal to the Court of

17   Appeals in this matter.

18             THE COURT:  Mr. Kennedy?

19             MR. KENNEDY:  Your Honor, I would object to a

20   stay because one of the Court's rationales, not all of the

21   Court's rationales, the Court has found that the

22   presumption to be overcome and the statutory factors in

23   that.  But part of the issue here is that there's a unique

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

37

1  prejudice to Mr. Watson given the state of the world right

2  now and how long a trial date will happen.

3             Did I raise the issue with the expert last

4  week?  No, because I didn't know about it because that's

5  what the Court asked me to do.  I don't need to get into

6  further that comment, but that's where we are.

7             I came here for status.  I filed the bond

8  motion because it became clear that we weren't going to be

9  able to go to trial on November 30th, and that's the issue

10  here.

11             If COVID hadn't happened, we would have tried

12  this case months ago.  If the Court had had motions

13  dockets for several months earlier this year, which the

14  Court did not, we would have heard these motions earlier.

15  But this is not normal.  We're in normal times.  And

16  releasing Mr. Watson ameliorates some of these issues

17  because we won't have to deal with them right now and we

18  can deal with them in a less emergency matter and we can

19  get this figured out.  But holding Mr. Watson, we don't

20  have statutory speedy trial right now, but we still have

21  Constitutional speedy trial.  That's still going on; it's

22  a different calculus, but that's obviously what we'd ask

23  for.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

38

1           A stay pending the Court of Appeals' action in

2      this case still doesn't get us there because then we're

3      still going to be back here with no November 30th trial

4      date and then we're still going to have to figure out what

5      we're going to do.

6           And the reason I didn't file for bond in

7      between March and now is because we were trying to get

8      this case tried, and that's what I've been trying to do.

9      There were things, quite frankly, many of which are beyond

10     my control.  We haven't been able to do that.

11          So I'd ask the Court to deny the stay.  The

12     Commonwealth still has all their rights available to it.

13     And set the case for status maybe in a month or two so we

14     can see where we are with Cybergenetics, my expert, and

15     the case in general.

16          MS. HAHN:  Your Honor, just to be clear, we

17     are going to be objecting to a continuance of the November

18     30th trial date.  The Commonwealth is ready to proceed

19     trial; our witnesses are ready.  The victim has been

20     waiting for justice for over six years.  The Commonwealth

21     does have some rights.  And I don't understand the

22     continued insistence by Mr. Kennedy on speedy trials

23     rights when he is asking for a continuance.  The

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

39

```
 1    Commonwealth is ready to proceed to trial.

 2              Mr. Kennedy could make this work if he wanted

 3    to with Cybergenetics.  He has come up --

 4              THE COURT:  How?

 5              MS. HAHN:  -- with every excuse in the book as

 6    to why he --

 7              THE COURT:  Ms. Hahn, how?

 8              MS. HAHN:  Mr. Shapiro just offered to fly up

 9    to Ohio and sit with his expert to go over this evidence.

10              THE COURT:  Mr. Shapiro offered to do that?

11              MS. HAHN:  He offered that --

12              THE COURT:  Did I miss that?

13              MS. HAHN:  -- about 30 minutes ago.

14              MR. SHAPIRO:  Yes.  What I said to the Court

15    was that I think if we could find some funding, I would go

16    up there and sit in a room and --

17              THE COURT:  What do you mean by "find some

18    funding"?

19              MR. SHAPIRO:  Your Honor, I can't be expected

20    to pay for myself to go up to Ohio on my own.  I

21    understand it's -- but all I'm trying to do is facilitate

22    this for Mr. Kennedy, his expert.  I understand the

23    pandemic.  And we're just trying to make sure
```

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, VIRGINIA 22030
(703) 591-3136
EXHIBIT 4

40

1   Cybergenetics, you know, their proprietary information is

2   not --

3           THE COURT:  See, that's the problem.  I don't

4   believe that a third party can come to this Court and make

5   those decisions.  I don't think a third party can say, "I

6   want to protect my business interest," and then this Court

7   has to jump through those hoops to get that done.

8           What authority does this Court have to give

9   any kind of funds for Mr. Shapiro to travel on behalf of

10  Cybergenetics?

11          MS. HAHN:  Well, Your Honor, I could request

12  Commonwealth funds since it's the Commonwealth's -- I

13  guess it's related to the Commonwealth.  Although, I think

14  they provided multiple options to this expert.

15          THE COURT:  Except an option that works.

16  There's also an option of sending a secure, password

17  protected device out there.

18          They are concerned that this expert is going

19  to risk his professional career for the benefit of

20  stealing their source code, putting it on the internet,

21  and completely ruining their business's ability to make

22  any money.  That is a concern of Cybergenetics.  That

23  concern I have to weigh versus all of the Constitutional

EXHIBIT 4

41

1    rights that Mr. Watson has when I have the Commonwealth

2    that is electing, which is certainly the Commonwealth's

3    prerogative, to elect to use this evidence.

4          I've heard that there's a co-defendant, who

5    the allegation is that person was there.  And there's

6    somebody else who says, "I've done a whole bunch of

7    robberies with Mr. Watson."  The Commonwealth is still

8    electing to use this evidence.

9          I don't understand the position that we've

10   elected to do this and now it's the Defendant's fault

11   because we've selected a company that's in Pennsylvania

12   that has this proprietary interest that is not comfortable

13   with sending the iPad in a pandemic when my expert can't

14   make it and continue to hold this man and force this case

15   to go forward November 30th.  I have not moved that trial

16   date.  You still have a November 30th trial date.  I

17   haven't gotten to that part.

18          MS. HAHN:  Your Honor, I think it comes down

19   to whether, and this goes back to Mr. Bezilla's argument a

20   week ago, whether it's reasonable to even be demanding the

21   source code as part of this whole process.  And when you

22   compare it to these EC/IR II cases, and that source code

23   in those cases that has deemed not needed, I think we have

EXHIBIT 4

42

1    our own position on that.

2              But putting all of that aside, I think

3    Cybergenetics has given multiple options.  We started in a

4    place where Cybergenetics said they're not seeing the

5    source code until they put down money; there's a security

6    deposit; there are liquidated damages; we sit with their

7    expert who only is in -- they've gone from that to just

8    come to our office; we'll let you take pictures of this

9    stuff.  And then to Mr. Shapiro saying, "I'll fly up to

10   Ohio" --

11             THE COURT:  So what's the difference, Mr.

12   Shapiro?  If they can take pictures in the Commonwealth,

13   why can't they take pictures in Ohio?

14             MR. SHAPIRO:  Limited.  I think the argument

15   was we said limited.  And what I'm saying, and I think on

16   the other argument when I did the motion to --

17             THE COURT:  And I think what you said was that

18   they can take pictures of parts they have --

19             MR. SHAPIRO:  Correct.

20             THE COURT:  -- concerns about --

21             MR. SHAPIRO:  If they had any concerns, we --

22             THE COURT:  -- but not the entirety.

23             MR. SHAPIRO:  -- had no problem, and we were

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

43

1    talking about stipulating to that evidence as admission

2    because I understand Mr. Kennedy's argued about expert

3    testimony when it comes to criminal because we haven't

4    switched to the federal rules where, you know, they can

5    rely on basically what they've reviewed in medical

6    journals and all that matter for criminal cases.

7              MS. HAHN:  And we've agreed to all those

8    stipulations.  We have no objection to stipulations.  If

9    the expert has health issues and wants to appear remotely,

10   we have no objections to that.  I've been trying to make

11   this work for a year and a half.  I've objected to a

12   number of continuances.  I've sent a federal witness back

13   to custody after eight months in isolation.  And I can't

14   believe we find ourselves here again with another

15   continuance and on top of that a bond motion for this

16   offense.

17             So, Your Honor, we are objecting to a

18   continuance of this case.  We would like to find a way to

19   make this work.  Mr. Shapiro and I are happy to work with

20   Mr. Kennedy to make this work in any way we can absent, of

21   course, of just sending an iPad.  And I can't speak to the

22   trade secrets argument, Your Honor.

23             THE COURT:  All right.  Thank you.

EXHIBIT 4

44

1          Here's what the Court is going to do:  I'm

2    going to amend the previous order that Cybergenetics is

3    ordered to send that secure -- actually, no.  I'm granting

4    Mr. Watson's motion for bond as I said, declining the

5    Commonwealth's request for a stay.  I'm going to set the

6    case for status on November 16th, if that's available for

7    counsel.

8          MS. HAHN:  Which day, Your Honor?

9          THE COURT:  November 16th or any day that

10   week.  I have calendar control that week, so any day that

11   week would be available, the week of November 16th.  And

12   what I am looking for is a better answer than

13   Cybergenetics' it has to be here and the expert can't make

14   it.  So whether it is Mr. Kennedy, on behalf of Mr.

15   Watson, locating a different expert, which I think would

16   likely mean a continuance of the trial, or Cybergenetics

17   coming up with some way that their expert can have access

18   to this that does not require that person to be physically

19   present in the Commonwealth of Virginia.  And then at that

20   point we can take up the motion to exclude or deal with

21   the trial date at that point.

22          MS. HAHN:  Your Honor, November 16th?

23          THE COURT:  Yes, ma'am.

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

45

1          MS. HAHN:  And Your Honor --

2          THE COURT:  Or any day that week.

3          MS. HAHN:  -- I suppose waiting that -- I have

4    to know before then about this trial date because there's

5    a writ for Mr. Rodgers to be brought over from Kentucky,

6    and the Sheriff's Offices will be furious with me if they

7    pay to bring him over and he'll be furious with me for

8    being put in isolation if we wait that long.

9          At this point I could object all I want to the

10   continuance, but I think it gets granted if these are the

11   Court's rulings.  So we might as well just set November

12   30th for status then move forward as it's going to happen.

13         THE COURT:  All right.

14         MS. HAHN:  And I'm available November 16th.  I

15   have to be done by 10:00 a.m.  I have a homicide plea with

16   Judge Bellows at 10:00.

17         THE COURT:  All right.  Just one moment.

18   Because this is Judge Shannon's assigned case, one moment.

19         MR. SHAPIRO:  And Your Honor, if may it please

20   the Court?  I know you're going to check with Judge

21   Shannon on the date.  I will tell the Court, November 16th

22   for Cybergenetics, for me at least, I have three cases in

23   the morning in GDC, so I can try to go back and forth, but

EXHIBIT 4

46

```
 1    I don't want to inconvenience the Court.

 2                 THE COURT:  That entire week I have calendar

 3    control, so any one of those days in the week of the 16th.

 4                 MR. SHAPIRO:  Thank you.

 5                 (Recess.)

 6                 THE COURT:  Back on the record in the matter

 7    of Commonwealth versus Watson, FE-2019-279.  Thank you all

 8    again.  Thank you all for your patience.  I had an

 9    opportunity to consult with Judge Shannon.

10                 What the Court is going to do, we will convert

11    the November 30th trial date to a status date for the

12    purpose of selecting another trial date.  In the interim,

13    the continuance will be granted to Mr. Watson.

14                 Mr. Kennedy, that would require Mr. Watson to

15    waive speedy trial between the continuance date and

16    whatever new trial date is selected.  I would ask that you

17    at least do that on the record.

18                 MR. KENNEDY:  I think it's statutorily tolled

19    forever anyway, but it's certainly our motion to continue

20    and toll speedy trial.

21                 THE COURT:  All right.  Thank you.

22                 So the November 30th court date will remain on

23    the docket, but it will be converted to status.  Rather
```

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136

EXHIBIT 4

47

1   than have us bring, especially considering all of the

2   mechanisms we have to go through for jury trials, I don't

3   want to subject 60 or 50 people to the potential of

4   showing up in the courthouse and then not having this case

5   go forward.  And if we move it soon enough, I think there

6   are some sexually violent predator cases that can use that

7   date.

8           Any questions about any aspect of that?

9           MR. KENNEDY:  Does the Court still want to set

10   a status the week of November 16th?

11           THE COURT:  No.  I don't think that's

12   necessary at this point because the point of the

13   intervening status was to see whether or not the trial

14   date was still going to be able to go forward and whether

15   or not you all could work out something between your

16   expert or Cybergenetics and come up with something.  I

17   still would hope that the parties would work towards that

18   so that we can try to get this back on the Court's docket,

19   but at this point I don't think it's necessary to have

20   another status before the 30th.

21           So Mr. Watson, at this time you will remanded

22   to the custody of the Sheriff to be processed out.

23           Do you, sir, have any questions about those

RUDIGER, GREEN & KERNS REPORTING SERVICE
CERTIFIED VERBATIM REPORTERS
4116 LEONARD DRIVE
FAIRFAX, V RGINIA 22030
(703) 591-3136
EXHIBIT 4

48

```
 1    bond conditions that the Court has set?

 2                THE DEFENDANT:  No, sir.

 3                THE COURT:  All right.  Mr. Watson, you need

 4    to make sure you stay in touch with Mr. Kennedy and his

 5    office.  And you need to make sure that you're in contact

 6    with the SRP Program and call in as instructed, comply

 7    with all the terms of your federal probation, and you need

 8    to be back in court present -- you need to be back in

 9    court on November 30th with Mr. Kennedy.

10                Yes, sir?

11                (Counsel conferred, off the record.)

12                MR. KENNEDY:  Your Honor, could I have one

13    moment of the Court's indulgence?

14                THE COURT:  Yes, sir.

15                (Counsel conferred, off the record.)

16                MR. KENNEDY:  Thank you.

17                THE COURT:  All right.

18                Sir, you will be remanded to the custody of

19    the Sheriff.

20                MS. HAHN:  Thank you, Your Honor.  Thank you

21    for hearing this matter.

22                MR. SHAPIRO:  Thank you, Your Honor.

23                THE COURT:  Thank you all.  And thank you for
```

EXHIBIT 4

49

1    your flexibility this morning.

2              MR. KENNEDY:  Thank you, Your Honor.

3

4                    *  *  *  *  *

5              (Whereupon, at approximately 10:29 o'clock

6    a.m., the hearing in the above-entitled matter was

7    concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

EXHIBIT 4

50

* * * * *

CERTIFICATE OF REPORTER

I, PETER P. BLOOM, a Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_____
PETER P. BLOOM
Verbatim Reporter

EXHIBIT 4