IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
            v.                  )        Criminal No. 19-369
                                )
LAFON ELLIS                     )

## MOTION FOR RECONSIDERATION

AND NOW comes the United States of America, through its counsel, Stephen R. Kaufman, Acting United States Attorney for the Western District of Pennsylvania, and Brendan T. Conway, Assistant United States Attorney for said district, and on behalf of the parties, respectfully submits its Motion for Reconsideration.

I.      PROCEDURAL BACKGROUND

By way of background, on August 21, 2018, the Pittsburgh Bureau of Police was searching for a vehicle involved in a homicide. They spotted the vehicle, observed the defendant as the driver, noted some traffic violations, and attempted to stop the vehicle. Ellis was the driver and sole occupant, and he led the police on a high-speed chase that resulted in him crashing the vehicle he was operating. He fled on foot, and the police were not able to catch him. The police chase and the defendant fleeing from the crashed vehicle was captured on dash camera video provided to the defense. A search of the vehicle revealed, among other things, a firearm on the driver's side near the brakes and accelerator.

Later DNA testing revealed Ellis's DNA on the gun. The DNA testing was conducted by a company called Cybergenetics, and it was analyzed through its proprietary TrueAllele software that it spent millions of dollars and thousands of hours developing. Cybergenetics also arranged to have the DNA tested using five other "open source" programs, which also led to a finding that the defendant's DNA was on the firearm. Thus, the results of the program have already been tested

and verified as accurate in this case, using this data.  Tellingly, the defense experts have not reported their intent to review the source code of the other five programs, all of which are available for review without violating trade secrets.  They are only interested in TrueAllele's source code.

The defense sought access to the source code for the TrueAllele software, and the parties filed various briefs related to that topic.  On February 3, 2021, shortly before the last of those briefs was due, the Superior Court of New Jersey issued an opinion in <u>State v. Pickett</u>, No. A-4207-19T4, 2021 WL 357765 (N.J. Super. Ct. App. Div. Feb. 3, 2021), which reversed a trial court decision denying the defense access to the TrueAllele's source code and related documents.  The defendant then filed a brief relying primarily on *Pickett* and four days later (February 26, 2021), the Court issued an order its denying the government's Motion to Quash relying on *Pickett* (ECF No. 138).  Thus, given the timing of the issuance of the *Pickett* decision, the filing of the defendant's pleading, and the Court's Order, the government did not address the many fallacies underlying the *Pickett* decision.

Since that time, as directed by the Court, the parties attempted to negotiate a Protective Order that protects Cybergenetics trade secrets from disclosure.  The defendant has proposed a Protective Order that provides no meaningful protections, is contrary to the standard in the industry, runs counter to the protective order endorsed by *Pickett*, is inconsistent with previous protective orders issued by this Court, and affords no meaningful remedy in the event of breach.  Thus, this case is about to enter another round of litigation related to the scope of the Protective Order -- a round that the Court should avoid by vacating its decision and granting the government's Motion to Quash.

II.   THE *PICKETT* DECISION IS RIFE WITH ERRORS AND INCORRECT ASSUMPTIONS

Since the issuance of the *Pickett* opinion, it has become apparent that the Court in *Pickett* made various embarrassing misstatements of fact and incorrect assumptions that very much undermine its holding.  Many of those misstatements and faulty assumptions are attributable to the fact that the Court in *Pickett*, like this Court, did not have a hearing related to the issue, which the government encourages the Court to do in connection with this motion.  Every Court that has ever held a hearing and heard the testimony of these defense experts has rejected their arguments; only this Court and the *Pickett* court, neither of which heard actual testimony, have accepted their arguments.[1]  That is because once their arguments and "facts" face the scrutiny of cross-examination, they wither.  And they wither because real scientists test the results of a computer program to determine its reliability; they do not read the source code.  Presumably because of the factual inaccuracies and faulty assumptions in the *Pickett* opinion, the New Jersey Supreme Court has stayed the *Pickett* decision as it considers whether to grant an appeal.

A.   Incorrect Assumption: Source Code Needed to Test

Near the outset of the opinion, the Court in *Pickett*, states as a "fact" something that is simply not a truthful statement.  The Court wrote: "The defense expert's access to the proprietary information is directly relevant to that question and would allow that expert to independently test whether the evidentiary software operates as intended. Without that opportunity, defendant is relegated to blindly accepting the company's assertions as to its reliability. And importantly, the judge would be unable to reach an informed reliability determination at the *Frye* hearing as part of

---

[1] A court in Virginia did order disclosure of TrueAllele's source code, but that order was prior to any contrary argument from the prosecutor or Cybergenetics.

his gatekeeping function." *Pickett*, 2021 WL 357765.[2]  It is unclear how the Court came to believe that the above-quoted statement is true, but it is plainly not true.  In science, the testing is done not through analysis of source code, but through testing the actual results, which are referred to as validation studies.

The Court of Appeals for the Sixth Circuit recently made that point clear in a case published after *Pickett*.  In United States v. Gissantaner, 990 F.3d 457 (6th Cir. 2021), the Sixth Circuit Court of Appeals reversed a District Court ruling excluding evidence from STRmix, which is the program that is the chief competitor to TrueAllele.  *Gissantaner* is an excellent primer on the history of DNA evidence and how programs like STRmix and TrueAllele work, and it is the first federal published case that has addressed these issues in any depth.  As the Court made clear, the hallmark of admissibility under *Daubert* is testing.  Critically, in determining whether STRmix could be tested, the Court did not refer to examination of source code, but by using lab-created mixtures in validation studies that examined the results of the programs.  Id. at 464.  These are the same type of validation studies that Cybergenetics and others have used to determine that TrueAllele produces accurate results.

And Cybergenetics is not the only entity to conduct validation studies on TrueAllele.  For example, the Forensics Services Laboratory in Beaufort, South Carolina conducted a validation study over the course of two years before it used TrueAllele in Court.  That laboratory, "tested all aspects of the TrueAllele program against known samples and unknown mixtures and found that TrueAllele produced expected results."  (Declaration of John Donahue attached hereto as Exhibit

---

[2] It is also important to note at the outset that New Jersey applies the *Frye* standard, whereas federal court applies the *Daubert* standard.  That is an important distinction unaddressed by this Court, particularly as the *Daubert* standard focuses on testing as that term in used in the scientific community.  As explained below, testing in the scientific community occurs through validation studies and not through review of source code.

A).  Similarly, the Virginia Department of Forensics Science, the Kern Regional Crime Laboratory in Kern County, California, and the Massachusetts States Police Laboratory validated the TrueAllele program, not through source code review, but by using known complex DNA profiles and comparing them to TrueAllele's results.  (Letter from Dr. Susan Greenspoon attached hereto as Exhibit B; Declaration of Dr. Kevin W.P. Miller attached hereto as Exhibit C; and Declaration of Joanne B. Sgueglia attached as Exhibit D).  In fact, one leading expert in this field affirmed that he was unaware of "any accredited forensic laboratory that requires source code for validation." (Declaration of Dr. Greg Hampikian attached hereto as Exhibit E).  And another expert wrote that the standard in this scientific area "recommends a performance-based approach for validating probabilistic software and do not mention anything about looking at the source code of the program."  (Declaration of Dr. Gary Shutler attached hereto as Exhibit F).

Validation studies, like the ones referred to above (and others), are not the only way to test the validity of the results of the TrueAllele software.  There is another way to test the software, and that is to run the same data on other software programs that are designed to also match DNA. The government engaged Cybergenetics to run the same data on various other programs, and the results are the same – Ellis' DNA is on that gun.

The defense has access to the data, and they could also use that data to test TrueAllele's results on the dozen or so other programs that exist in this field.  The defense also has access to the TrueAllele software and they can test it to their heart's content like has been done in validation study after validation study.  They refuse to test the software, at least as far as the word "test" is used in this field.  Thus, in terms of "testing" as that term is used in *Daubert* and *Gissantaner*, the defense has the ability, just not the inclination, to test the software, and *Pickett*'s statement to the contrary is just not accurate.

The *Gissantaner* Court also focused on the fact that STRmix, like TrueAllele, has been subjected to peer review and publication.  The *Pickett* Court, in granting access to TrueAllele's source code, essentially ignored that peer review and publication associated with TrueAllele because much of the publication was authored, at least in part, by Dr. Mark Perlin, the founder of Cybergenetics, who has an interest the affirmation of TrueAllele's results.  The *Gissantaner* Court demonstrated the *Pickett* Court's misunderstanding of peer-review process in the scientific community by first accurately explaining the process.  The *Gissantaner* Court then further explained that, "[p]eer review contains its own independence"; and that acceptance for publication in a reputable scientific journal after peer-review, "represents a significant indication that it is taken seriously by other scientists." Id. at 465 (internal quotations and citations omitted).  Clearly, the *Pickett* Court did not understand the peer-review process and did not appreciate the implication of peer review.  Thus, once again, the *Gissantaner* Court represents a much better foundation from which to decide these important issues.

B.  Incorrect Assumptions:  FST, STRmix and How Errors in Software are Found[3]

One of the foundations of the *Pickett* opinion seems to be the assumption that the defense experts found errors through source code review in similar types of software before and therefore they should be afforded the opportunity to review the TrueAllele source code to look for similar errors.  On its face, that finding was reasonable given the misleading declarations from the defense experts and the fact that those declarations were not challenged through cross-examination.  The reality, however, is far different.  For example, the *Pickett* Court referred to Forensic Statistical Tool (FST) as a "discontinued program" and as a "cautionary tale."  Id. at *17.  One would assume, if one just read the *Pickett* opinion, that FST was no longer in use due to discovery of source code errors or because it was discredited.  If one would make that assumption, one would be wrong.

FST's reliability has repeatedly been upheld and it is still in use.  As recently as last year, the Second Circuit determined that there was no error in determining that FST evidence was reliable and therefore admissible. United States v. Jones, 965 F.3d 149 (2d Cir. 2020).  The same expert in this case, Nathan Adams, testified as a defense expert.  After the *Daubert* hearing, however, the district court denied the defendant's motion to exclude FST's analysis, finding that it was sufficiently reliable for admission, and the Second Circuit found no error in the admission of the results. Id. at 162.[4]

The *Pickett* Court's statements related to STRmix, and the declarations by the defense exhibits, may have been even more erroneous than the statements related to FST.  In fact, the

---

[3] The Prosecutor of Hudson County, New Jersey and the Attorney General of New Jersey submitted briefs to the New Jersey Supreme Court (Exhibits G and H, respectively) that address the many factual inaccuracies and incorrect assumptions underlying the *Pickett* opinion, and those arguments are incorporated into this motion as if set forth in full.

[4] The *Jones* Court is not the only Court that rejected the testimony of Mr. Adams.  The government's research revealed example after example of courts rejecting Mr. Adams' testimony and no examples of a court agreeing with Mr. Adams after hearing Mr. Adams testify.

statements made regarding STRmix by the court and in the defense expert declarations were so incorrect that the STRmix manufacturer issued a response to the decision entitled "Incorrect comments relating to STRmix in State of New Jersey v Corey Pickett." (Exhibit I).

For example, the defense expert on which the *Pickett* Court relied represented that flaws in the STRmix programs called into question thousands of convictions and frequently went undiscovered until the source code was reviewed by the judicial process.  To call that statement disingenuous would be kind.  The reality is that "[n]one of the miscodes in STRmix have been found by code review and none have affected a conviction. . . . None [of the miscodes] have been found as part of the judicial process." (Exhibit I, p. 1).[5]  Thus, to the extent that the defense experts imply that they found some sort of miscoding in STRmix, they did not provide the *Pickett* Court and they are not providing this Court with accurate information.

Even more embarrassing, the *Pickett* Court cited a tabloid Australian newspaper in support of its opinion, which, of course, did not get the facts right.  In fact, a review of over 20,000 cases in South Australia and New Zealand only identified 22 instances of this miscode firing in the STRmix software.  The miscoding was discovered by laboratory analysis and not investigators or independent researchers; the changes were minor; and in all instances the change was made before the case was heard.  (Exhibit I, p. 2).

The most important takeaway from a review of this material is that the *Pickett* Court was somehow convinced, despite a lack of an evidentiary hearing, that review of the source code led to the discovery of significant flaws in these types of software.  That is simply not true.  Sure, errors have been found in other programs, but the errors were found in testing of the software, not by code review.  And the errors were minor, discovered by testing, and then confirmed in the code.

[5] See also Declaration of Dr. Michael Gorin, attached hereto as Exhibit J, in which Dr. Gorin opines that programs like TrueAllele are validated through testing and not through review of source code.

Thus, once again, the *Pickett* Court just did not get the facts right, and those factual errors led to an improper conclusion.  This Court should not exacerbate that mistake by relying on *Pickett*.

      C.  <u>Improper Reliance on PCAST Report</u>

Just as problematic as making factual misstatements and faulty assumptions, is the *Pickett* Court's reliance on the findings in President's Council of Advisors on Sci. & Tech., Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods 5 (2016) (PCAST Report).  The primary conclusion from the PCAST Report relied on by the *Pickett* Court is its requirement for independent evaluation, which led to its devaluation of TrueAllele's validation studies involving Dr. Perlin because they were not the type of independent studies called for by PCAST.  However, the PCAST Report has been denounced by the forensic science and associated law enforcement community, including the Department of Justice and the Federal Bureau of Investigation.

The *Pickett* Court correctly noted that there had been thirty-six validation studies conducted by Cybergenetics, law enforcement crime labs, or both, including the fact that seven of the studies have been published in peer-review journals.  The Court then, relying on the PCAST Report, dismissed the value of those validation studies and the process of peer-reviewed journals because Dr. Perlin authored six of the seven peer-reviewed publications. <u>Pickett</u>, 2021 WL 357765, at *18.  The Court took issue with the involvement of law enforcement agencies participating in the studies as they "likewise share an interest in the continued viability of the program." <u>Id</u>. Therefore, the Court found that for purposes of reliability in the criminal context, evaluations "should be performed by an expert working on behalf of someone in defendant's shoes." <u>Id</u>.

First, this Court should reject the notion that law enforcement crime labs' involvement in validation cuts against software reliability. Law enforcement crime labs are interested in the truth

and accurate testing.  Moreover, as set forth above in declarations, serious scientists in this field conducted serious validation studies that affirmed the accuracy of TrueAllele's results in various laboratories throughout the Country.  As such, the reliance and emphasis on the PCAST Report are misplaced as the forensic science and associated law enforcement community have denounced the report.  In addition, the Court should note that TrueAllele has not just been used by law enforcement.  In fact, it has often been used for exonerations, just as one would expect in an objective program like TrueAllele.[6]  The TrueAllele program does not care whether it is working for the prosecution of the defense; it does not care whether the identified person is included or excluded from the same.  That is the point – it is objective.

Second, discounting peer-reviewed articles because they were authored by a person involved in the program is inconsistent with the caselaw on this topic, and not just by the Sixth Circuit as discussed above. In fact, the Nebraska Supreme Court affirmed a conviction based on TrueAllele's results using a similar analysis related to the peer-review to the analysis of the *Gissantaner* Court discussed above.  See e.g., State v. Simmer, 304 Neb. 369, 386 (2019) (in case involving TrueAllele, Mr. Adams and Dr. Perlin, Court found that peer-reviewed publication is valuable because it places research in the public domain, permits evaluation, and permits criticism).

Third, TrueAllele is compliant with the relevant scientific standards.  TrueAllele is compliant with the Scientific Working Group's validation guidelines on DNA Analysis Methods

---

[6] See State v. Gates, 840 S.E.2d 437, 439-40 (Ga. 2020); Georgia Supreme Court Affirms Right to a New Trial Based on TrueAllele Evidence, Forensic Mag (March 24, 2020) (available at https://www.forensicmag.com/562235-Georgia-Supreme-Court-Affirms-Right-to-a-New-Trial-Based-on-TrueAllele-Evidence/).

See also: https://www.cybgen.com/news/exoneration/page.shtml

(SWGDAM), which is a group of approximately fifty scientists representing federal, state, and local forensic DNA laboratories in the United States and Canada. TrueAllele is also compliant with the standards set forth by the American National Standards Institute (ANSI) and AAFS Standards Board (ASB) for 2018, 2019, and 2020. These forensic-science standards are based on the well-accepted scientific method of testing and validation, which should guide this Court instead of a report rejected by the relevant community. Critically, none of the standards for validation require analysis of source code; they are based on "testing" as that word it used in the scientific community, i.e., through validation studies.

> D. Factual Inaccuracy: Authority House of Cards

Ironically, the *Pickett* court referred to the vast authority rejecting access to source code as an "authority house of cards." The irony of that statements is that it was the *Pickett* opinion that, as outlined above, is built on a foundation of misstatements of fact, incorrect assumptions, and faulty science. What is even more ironic is that the *Pickett* Court made that statement after never even holding a hearing related to this issue. And the final irony is that *Pickett* is creating an authority house of cards, as this Court accepted its flawed rationale.

For more than a decade, the defense experts sought a ruling like they obtained in *Pickett* and from this Court. In every case in which access to the source code was disputed, courts across this country uniformly rejected the argument because, as discussed above, science is based on testing of the program through validation studies, not on review of source code. Faced with the mountain of authority contrary to its position, the *Pickett* court incorrectly concluded that this authority stemmed from one incorrect decision – Com. v. Foley, 2012 PA Super 31, 38 A.3d 882,

888 (2012) (holding that Dr. Perlin's testimony was properly admitted) – on which the subsequent authority was based.  Once again, the *Pickett* Court is embarrassingly wrong.[7]

The plain and undeniably truthful fact is that Court after Court, in jurisdictions not bound by the *Foley* decision, after conducting hearings on this subject (including some involving the same experts in this case), uniformly concluded that disclosure of the source code was not necessary.  Many of these opinions are lengthy, include detailed analysis, and reflect consideration of voluminous material.  It is plainly inaccurate to claim that all of these Courts simply blindly relied on *Foley*, as any fair reading of the opinions establish.  While *Foley* may have been the first decision, many of the subsequent decisions were in independent jurisdictions and were based on evidence challenged at a hearing.  The authority is not a house of cards, but unwavering line of precedent built on a foundation reliant on evidence and science and faithful to the facts and science. See e.g., State v. Shaw, No. CR-13-575691 (Ohio C.P. Ct. Cuyahoga Cnty. Oct. 10, 2014) (Exhibit K) (holding, after hearing a motion to compel the production TrueAllele's source code that the "established that the TrueAllele methodology and the State's witness are reliable without the use of source code."); Commonwealth v. Brady, Case Nos. CR11-465 and CR11-494 (VA Cir. Ct. of City of Colonial Heights Dec. 17, 2013) (Exhibit M) (holding, after hearing the testimony of multiple experts, that TrueAllele was determined to be sufficiently reliable for admissibility

---

[7] Other Pennsylvania cases that do place reliance on *Foley*. See e.g., Commonwealth v. Knight, No. 379 WDA 2017, 2017 WL 5951725, at *6 (Pa. Super. Ct. Nov. 29, 2017) (holding that the source code for TrueAllele was not material to Appellant's defense and his request to compel its production was not reasonable).  The defendant in one Pennsylvania case, however, argued that *Foley* was not binding and therefore the Court (Judge Rangos) held a two-day hearing in which the Court addressed the source code issue. Dr. Perlin testified on behalf of the Commonwealth while Dr. Ranajit Chakraborty testified on behalf of the defense.  The defendant alleged that TrueAllele's reliability could not be evaluated without the source code. The Court, however, determined that the source code was not material to the defendant's ability to pursue a defense and denied the discovery motion as to the production of source code. See Commonwealth v. Robinson, Case No. CC201307777 (Allegheny County Ct. of Common Pleas Fed. 4, 2016) (Exhibit L).

without the need to access the source code); State v. Wakefield, 47 Misc. 3d 850, 854, 9 N.Y.S.3d 540, 543 (N.Y. Sup. Ct. 2015) (holding, after a hearing involving the testimony of multiple experts, that "scientists can, and have, validated the reliability of Cybergenetics TrueAllele Casework even though the source code underlying the process is not available to the public.").

The line of authority also includes cases in which the same exact experts involved in this case testified at hearings related to the source code. In every one of those cases, the courts rejected defendants' attempts to access TrueAllele's source code. The case of Washington v. Fair, Case No. 10-1-09274-5 SEA (WA Superior Ct. King Co. Jan. 12, 2017 (Exhibits N and O)), is a good example. In that case, the Court was considering a defense motion to compel production of TrueAllele's source code. A number of experts testified, including Dr. Perlin and Jay Caponera on behalf of the State and Mr. Adams, Dr. Dan Krane, Dr. Kirk Lohmueller, and Mr. Brian Ferguson on behalf of the defense. After hearing testimony from all of the experts and examination of voluminous material, the Court concluded that "TrueAllele has been validated for use in casework by laboratories in California, Louisiana, Maryland, New York, Ohio, Pennsylvania, South Carolina, Virginia, Northern Ireland and Australia without having access to the source code," and that "an examination of the source code is not necessary in order to determine the reliability of TrueAllele and validate it for casework." (Id. p. 8). See also Tennessee v. Watkins, Case No. 2017-C-1811 (TN Crim. Ct. of Davidson Co. December 17, 2018) (Exhibit P) (holding, after *Daubert* hearing in which Dr. Perlin and Mr. Adams testified, in a lengthy and comprehensive opinion, that validation studies, and not source code review, is best way to test reliability and that TrueAllele met the *Daubert* standard).

Another example is a published case from the Supreme Court of Nebraska. State v. Simmer, 935 N.W.2d 167, 172 (Neb. 2019). As in this case, through Mr. Adams, the defense

requested access to TrueAllele's source code. Id. at 177. "Adams testified that TrueAllele had achieved only the 'illusion of validation' because it had not been validated in the domain of software engineering." Id. "Adams acknowledged the studies in the record validating TrueAllele, but claimed that there is a difference between the 'forensic DNA definition of validation and the software engineering definition of validation.'" Id. at 180. "In particular, Adams expressed concerns that the TrueAllele software source code had not been subjected to independent testing. He testified that without such a review, confirmation was lacking as to whether the TrueAllele software actually performs as described by Perlin." Id. Simmer also argued, "that the validation studies must be discounted because Perlin is a coauthor of some of the publications and, as the owner of the company that owns TrueAllele, has a financial interest in seeing it found reliable." Id.

The Supreme Court of Nebraska rejected both arguments. The court noted, "Perlin's part in the validation studies was not as pervasive or unchecked as Simmer suggests. Perlin was not involved in [ten] validation studies in the record. In addition, [six] of the studies in which he was listed as an author were published in peer-reviewed publications" and that "Perlin was not the lone author on any of the published, peer-reviewed validation studies. That is, other members of the scientific community also staked their reputations on the reliability of TrueAllele." Id.

Regarding source code, The Nebraska Supreme Court affirmed the trial court's decision to not compel production of the source code. Contrary to the *Pickett* Court's assertion that previous courts had not addressed source code or computer science, the court in *Simmer* determined that it was not "required to find that TrueAllele had been validated 'from a software engineering perspective' to find it reliable." Id. at 180. Rather, the court relied on the State's presentation of "significant evidence that TrueAllele is reliable." Id. at 181. The evidence included "Perlin's

testimony and copious documentary evidence describing TrueAllele's methodology," the fact that "SWGDAM has approved the use of validated and documented probabilistic genotyping software and provided guidelines for its validation," which "TrueAllele has complied with" and finally that "TrueAllele's methodology has been repeatedly tested and validated in peer-reviewed studies." Id. at 181-82. See also People v. Superior Ct. (Chubbs), Case No. B258569, 2015 WL 139069, at *10 (Cal. Ct. App. Jan. 9, 2015) (holding that TrueAllele's source code is not necessary to judge the software's reliability and that that the trial court abused its discretion in ordering disclosure of the TrueAllele source codes). As is clear from the above, the authority that developed in this area was not based on some blind reliance on *Foley* as the *Pickett* Court incorrectly claimed but on hearings and independent evaluation of testimony and voluminous materials. The *Pickett* Court's arrogant dismissal of these opinions is, like much of the opinion, simply wrong.

Thus, at this point, any reliance the *Pickett* opinion is highly suspect because the Court made innumerable factual errors and incorrect assumptions. Of course, this Court could not have known that the *Pickett* opinion stood on such unsteady ground, and the government was unable to bring that fact to the Court's attention because of the short time before the filing of the defendant's brief and the Court's issuance of its Order. In any event, any reliance on *Pickett* is now completely misplaced, and this Court should reconsider, vacate its ruling, and grant the government's Motion to Quash.

III.     <u>THE COURT SHOULD AT LEAST HOLD A HEARING</u>

Alternatively, if the Court is not inclined to reverse itself and grant the Motion to Quash, the Court should, unlike its counterpart in *Pickett*, hold a hearing so that this Court does not make the same mistakes as the court in *Pickett*.  The Court should hear from the experts, and the government should be permitted to cross-examine Mr. Adams or any of the other defense experts who claim that they need to review the source code to determine the validity of TrueAllele's results.  This issue is too important to the parties and the advancement of science to decide without hearing from these experts.

STEPHEN R. KAUFMAN
Acting United States Attorney

<u>s/ Brendan T. Conway</u>
BRENDAN T. CONWAY
Assistant U.S. Attorney
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
PA ID No. 78726